## Case No. 3,621a.

### Case of DAVIS.

[Chase, 1; 3 Am. Law Rev. 368.] [1]

Circuit Court, D. Virginia.  1867–1871.

CIVIL COURTS DURING PERIOD OF MARTIAL LAW— CIRCUIT JUSTICES —TREASON BAILABLE — PRACTICE — EFFECT OF FOURTEENTH AMENDMENT ON PRIOR TREASONS.

[1. Neither the chief justice nor any of the associate justices of the United States, exercising, as they do, the highest judicial authority of the nation, can, with propriety, join in holding a circuit court in a region which is subject to martial law, and in which, consequently, the civil courts, both state and federal, must act under the supervision of the military authorities. Nor should such justice, acting as a single judge, exercise any jurisdiction in such district, even to the extent of hearing an application to admit a prisoner to bail.]

[2. Where a prisoner is in the custody of the military power in a region subject to martial law, the judge of a civil court cannot hear an application to admit the prisoner to bail until the legality of the military custody has been inquired into, by means of an application for a writ of habeas corpus.]

[3. The fact that congress, by the act of July 17, 1862, gave the courts authority, in their discretion, to impose fines and imprisonment, instead of death, as the punishment for treason, removed all doubt as to the offense being a bailable one.]

[4. On a motion to quash an indictment for treason, held that defendant's counsel would be required to file with the clerk a formal statement of the grounds upon which the motion was based.]

[5. The circuit justice and the district judge holding the court differed in opinion on the question whether the provision of the fourteenth amendment, disqualifying from holding certain offices any persons who engaged in rebellion after having taken an oath to support the constitution of the United States, operated to exempt a person so offending from subsequent prosecution for treason, the circuit justice being of the opinion that the provision did so operate. The question was accordingly certified to the supreme court.]

[Proceedings in reference to the prosecution of Jefferson Davis for treason against the United States.]

The city of Richmond, the capital of the Confederate States, having been evacuated by the military forces of that government on the second and third days of April, 1865, the Honorable Jefferson Davis, the president of the Confederate States, left that city, with his cabinet, and proceeded to Danville, Virginia. He remained at this place endeavoring to reorganize resistance to the armies of the United States, when the surrender of General Lee on the nineteenth of April, at Appomattox Court House, destroyed all hopes of present success in Virginia; and on the eleventh he proceeded to Greensboro, in North Carolina, fifty miles distant, whither he summoned Generals Johnston and Beauregard, then commanding the Confederate troops in North Carolina, which were facing and falling back before the armies of Gen-

eral Sherman. While here the pressure of military necessities forced Johnston into negotiation with Sherman for a general pacification of the states of the south, forming the Confederate States, on the basis of a return of states and citizens to their positions as members of the United States, and an absolute cessation of all resistance to the laws of the United States. These negotiations did not meet with the approbation of Mr. Davis, and he left Greensboro while they were pending, accompanied by his cabinet and a cavalry escort of detachments from Ferguson's and Dibbrell's brigades of Wheeler's division. He journeyed at easy stages of twenty miles a day, and halted at Charlotte, ninety miles distant from Greensboro, to learn the result of the memorandum, or basis of agreement for a peace, which had been signed by Johnston and Sherman on the eighteenth, four days after his departure from Greensboro. The president of the United States disapproved the memorandum of the eighteenth of April, just referred to, and Johnston, on the twenty-sixth, entered into and executed a military convention with Sherman, by which his whole command, comprising all troops east of the Chattahoochee, were bound to lay down their arms on condition of being paroled to remain unmolested while they obeyed the laws, the officers being allowed to retain their side-arms. As soon, however, as Mr. Davis learned of the failure of the memorandum of the eighteenth, he proceeded with his escort through Abbeville, South Carolina, to Washington, Georgia, which place he reached on the second of May. On the fourth he dismissed his escort, and on taking leave of its commander said: "I expected to cut my way through to a place of safety, with the two detachments of cavalry along with me, but they have become so much demoralized by the reports of stragglers and deserters from Johnston's army, that I can no longer rely on them in case we should encounter the enemy. I have therefore determined to disband them and try to make my escape, as a small body of men can elude the vigilance of the enemy easier than a larger number. They will make every effort in their power to capture me, and it behooves us to face these dangers as men. We will go to Mississippi, and there rally on Forrest, if he is in a state of organization, and it is to be hoped that he is; if not, we will cross the Mississippi river and join Kirby Smith, and there we can carry on the war forever. Meet me south of the Chattahoochee, as this department has been surrendered without my knowledge or consent." Leaving Washington he proceeded, with the officers with him, and his family, westward through Georgia, when on the tenth he was captured with his whole party at Irwinsville, Wilkinson county, by Lieutenant-Colonel Pritchard of the 4th Michigan cavalry, and a part of his command, belonging to Wilson's corps. With him were John H. Reagan, late governor of

---

[1] [Reported by Bradley T. Johnson, Esq., and here reprinted by permission. 3 Am. Law. Rev. 368, contains only a partial report.]

Texas, and subsequently postmaster-general of the Confederate States, Colonel Burton N. Harrison, private secretary of the president, Stephen R. Mallory, secretary of the navy, and others, with a train of five wagons and three ambulances. He was taken to Savannah and thence by steamer to Fortress Monroe, in Virginia, where he was confined in one of the casements of the fortification until the thirteenth day of May, 1867, when he was released on bail, in the manner and under the circumstances which it is the purpose of this statement to record.

During the time between the surrender of General Lee on the ninth of April, and the arrival of Mr. Davis at Washington, Georgia, on the second of May, momentous events were transpiring elsewhere. The president of the United States was assassinated at a theatre in Washington on the night of April fourteenth. Andrew Johnson, vice-president, immediately took the official oath and assumed the duties of president, and the whole country was thrown into a paroxysm of excitement. On the second of May, the day the president of the Confederate States reached Washington, Georgia, the president of the United States issued the following proclamation: "Whereas, it appears from evidence in the bureau of military justice, that the atrocious murder of the late president, Abraham Lincoln, and the attempted assassination of the Honorable William H. Seward, secretary of state, were incited, concerted, and procured by and between Jefferson Davis, late of Richmond, Virginia, and Jacob Thompson, Clement C. Clay, Beverly Tucker, George N. Sanders, W. C. Cleary, and other rebels and traitors against the government of the United States, harbored in Canada: Now, therefore, to the end that justice may be done, I, Andrew Johnson, president of the United States, do offer and promise for the arrest of said persons, or either of them, within the limits of the United States, so that they can be brought to trial, the following rewards: one hundred thousand dollars for the arrest of Jefferson Davis; twenty-five thousand dollars for the arrest of Jacob Thompson, late of Mississippi; twenty-five thousand dollars for the arrest of George N. Sanders; twenty-five thousand dollars for the arrest of Beverly Tucker; and ten thousand dollars for the arrest of William C. Cleary, late clerk of Clement C. Clay. The provost-marshal general of the United States, is directed to cause a description of said persons, with notice of the above rewards, to be published."

The attorney-general of the United States, the Honorable James Speed, of Kentucky, had on the previous day given his official opinion in writing to the president of the United States, "that persons implicated in the murder of the late President Lincoln, and the attempted assassination of the Honorable William H. Seward, secretary of state, and an alleged conspiracy to assassinate other officers of the federal government at Washington City, and their aiders and abettors, are subject to the jurisdiction of and legally triable before a military commission." On the first day of May therefore, the president of the United States, issued his order, reciting this opinion of his attorney-general, and directing the assistant adjutant-general to detail nine competent military officers to serve as a commission for the trial of said parties, and that the judge advocate-general proceed to prefer charges against said parties for their alleged offenses. The proclamation offering the reward for Mr. Davis on its "appearing from evidence in the bureau of military justice" was made the next day, May second, and it is clear, therefore, it was the intention of the government of the United States at that time to try him before a military commission on the charge of having procured the assassination of Mr. Lincoln. He was captured, as we have seen, by Lieutenant-Colonel Pritchard and a detachment of cavalry, on the tenth of May. As soon as he was in custody at Fortress Monroe, preparations were made to try him. Notwithstanding the proclamation of May second, offering a reward for his apprehension as an incitor in the murder of Mr. Lincoln, the government at once resolved to prosecute him for treason. About the same time the president of the United States sent the Hon. Preston King, of New York, to Judge John C. Underwood, judge of the United States district court for the district of Virginia, to request the latter to wait upon him at the executive mansion in Washington. The consultation between the president and the judge was had at once, the subject of it being the prompt initiation of legal proceedings against the leaders of the civil war (on the losing side of course), some of whom they thought especially responsible for the late assassination. The president learned, on inquiry, that a court was to be held in Norfolk during the month of May, and that the grand jury had been already summoned. He and Mr. King expressed the desire, and believed it to be the duty of the court, to present to the grand jury the views of the supreme court of the United States, as expressed by Mr. Justice Greer, that the late civil war was a rebellion, and that those who had been engaged in it were, not only enemies to the United States, but were also guilty of treason, and that the more prominent and guilty leaders ought to be indicted for their conduct, resulting, as they thought, and culminating in the assassination of Mr. Lincoln. Although Judge Underwood had previously taken the position that the great conflict had outgrown the character of a rebellion, and had assumed the dimensions of a civil war, and that sound policy and humanity demanded that the technical treason of its beginning should be ignored, and that it should be treated only as a civil war, and those engaged in it only as enemies, he says that under the overwhelming excitement of the times, he for a

time·distrusted his own judgment, thinking, perhaps, that his education in the principles of the Society of Friends and his former hostility to capital punishment had misled him, and he consented to charge the jury as they advised. (Memorandum furnished by Judge Underwood.) After this interview he proceeded to Norfolk, opened the court there, and did charge the jury in the precise language suggested by the president and Mr. King, with the limitation that it would be improper to include in their presentments any but the most influential and guilty, naming no one. Upon this the grand jury found an indictment against Mr. Davis and others for treason, but the motion of the district-attorney for bench warrants was refused, the court taking the ground that in no event would bench warrants be issued against those who had· surrendered to commanding generals on parole, and who had kept the faith on which the parole was granted. This indictment has been lost from the records of the court during the summer of 1865. The case of Mr. Davis was specially considered in the cabinet, and the question discussed whether he should be prosecuted in Virginia, Maryland, Pennsylvania, or the District of Columbia, acts of war having been committed within each of those jurisdictions by the armies of the Confederate States, of which Mr. Davis was president and constitutional commander-in-chief.

An indictment was found in the District of Columbia, but no process was ever issued on it, and matters remained thus until the twenty-first of September, 1865, when the senate of the United States, by resolution, called upon the president for information on the subject of the trial. In response to this inquiry the following reports were submitted from the secretary of war, Honorable Edwin M. Stanton, and the Honorable James Speed, attorney-general:

"War Department, January 7, 1866. Sir: To the annexed senate resolution, passed on the twenty-first day of December, 1865, referred to me by you for report, I have the honor to state: 1. That Jefferson Davis was captured by the United States troops in the state of Georgia, on or about the tenth day of May, 1865, and by order of this department has been, and now is confined at Fortress Monroe, to await such action as may be taken by the proper authorities of the United States government. 2. That he has not been arraigned upon any indictment or formal charge of crime, but has been indicted for the crime of high treason by the grand jury of the District of Columbia, which indictment is now pending in the supreme court of said district. He is also charged with the crime of inciting the assassination of Abraham Lincoln, and the murder of Union prisoners of war, and other barbarous and cruel treatment toward them. 3. The president deeming it expedient that Jefferson Davis should be put upon his trial before a competent court and

jury for the crime of treason, he was advised by the law officer of the government that the proper place for such trial was in the state of Virginia. That state is within the judicial circuit assigned to the chief justice of the supreme court, who has held no court there since the apprehension of Davis, and who declines for an indefinite period to hold any court there. The matters above stated are, so far as I am informed, the reasons for holding Jefferson Davis in confinement, and why he has not been tried."

The then attorney-general enters into an argument to show that, although originally captured by the military, Jefferson Davis and other parties alluded to are, after a cessation of hostilities, subject to trial only by the civil courts. The following are his official conclusions: "I· have ever thought that trials for high treason can not be had before a military tribunal, The civil courts have alone jurisdiction of that crime. The question then arises: Where and when must the trial thereof be held? . . . It follows, from what I have said, that I am of opinion that Jefferson Davis and others of the insurgents ought to· be tried in some one of the states or districts in which they in person respectively committed the crimes with which they may be charged. . . . When the courts are open, and the laws can be peacefully administered and enforced in those states whose people rebelled against the government—when thus peace shall have come, in fact and in law, the persons now held in military custody as prisoners of war, and who have not been tried and convicted for offenses against the laws of war, should be transferred into the custody of the civil authorities of the proper districts, to be tried for such high crimes and misdemeanors as may be alleged against them."

On the sixteenth day of January, 1866, the senate called upon the president for the correspondence between himself and Chief Justice Chase. On the second day of February the president responded, enclosing the following correspondence between himself and the chief justice:

"Executive Mansion, Washington, D. C., October 2d, 1865. Dear Sir: It may become necessary that the government prosecute some high crimes and misdemeanors committed against the United States within the district of Virginia. Permit me to inquire whether the circuit court of the United States for that district is so far organized and in condition to exercise its functions that yourself, or either of the associate justices of the supreme court, will hold a term of the circuit court there during the autumn or early winter, for the trial of causes? Very respectfully, Andrew Johnson.

"Hon. S. P. Chase, Chief Justice Supreme Court."

"Washington, Thursday Evening, Oct. 12, 1865. Dear Sir: Your letter of the second, directed to Cleveland, and forwarded to Sandusky, reached me there night before last.

I left for Washington yesterday morning, and am just arrived. To your inquiry, whether a term of the circuit court of the United States for the district of Virginia will be held by myself or one of the associate justices of the supreme court during the autumn or early winter, I respectfully reply in the negative. Under ordinary circumstances, the regular term authorized by congress would be held on the fourth Monday of November, which, this year, will be the twenty-seventh. Only a week will intervene between that day and the commencement of the annual term of the supreme court, when all the judges are required to be in attendance at Washington. The time is too short for the transaction of any very important business. Were this otherwise, I so much doubt the propriety of holding circuit courts of the United States in states which have been declared by the executive and legislative departments of the national government to be in rebellion, and therefore subjected to martial law, before the complete restoration of their broken relations with the nation, and the supersedure of the military by the civil administration, that I am unwilling to hold such courts in any such states within my circuit, which includes Virginia, until congress shall have had an opportunity to consider and act on the whole subject. A civil court in a district under martial law can only act by the sanction and under the supervision of the military power; and I can not think it becomes the justices of the supreme court to exercise jurisdiction under such conditions. In this view, it is proper to say that Mr. Justice Wayne, whose whole circuit is in the rebel states, concurs with me. I have had no opportunity of consulting the other justices, but the supreme court has hitherto declined to consider cases brought before it by appeal or writ of error from circuit or district courts in the rebel portion of the country. No very reliable inference, it is true, can be drawn from this action, for circumstances have greatly changed since the court adjourned; but, so far as it goes, it favors the conclusion of myself and Mr. Justice Wayne. With great respect, yours very truly, S. P. Chase."

While these efforts were being made to procure a trial of Mr. Davis on the charge of treason, the official allegation of his complicity in the assassination of Mr. Lincoln was crushed out under the common, general, and uncontroverted belief in its utter falsity, absurdity, and groundlessness. It was never made the basis of any action save the proclamation of the second day of May, 1865, when it was generally believed in the north that he had escaped from the country; and at the very moment that the assertion of the belief of the government of the United States in his criminality as charged, was being telegraphed wherever there was electrical wire, he was journeying quietly with his cabinet, family, and train of wagons and ambulances through the state of Georgia.

This terrible charge, so publicly made, was abandoned, because utterly without foundation or excuse, but it never was withdrawn. In the meantime the southern states, lately constituting the Confederate States, through their state legislatures, asked the federal government to release him and declare a general amnesty, and at the same time efforts, equally unavailing, were being made on the part of distinguished men in the north to procure his release on bail or parole. A statement of these efforts, as communicated to the reporter by counsel (the Honorable Charles O'Conor), is deemed a fit part of this report.

Had Jefferson Davis, or his party with his assent, raised the black flag, denied quarter to prisoners, or otherwise placed themselves, as combatants, beyond the pale of those rules which govern in war, he might have been shot without trial or ceremony, immediately upon his capture, or thereafter, at the captor's convenience. But he never occupied that position, and the government, if inclined, could not have signalized its triumph by ordering a military execution without provoking censures that few are willing to encounter. Probably no such inclination ever existed in any controlling mind.

When traitors and rebels oppose their government by open violence, and are summarily put down, those not slain in the combat may fairly be tried for treason in the civil courts and dealt with as ordinary criminals. The transaction constitutes only a species of riot. But far different results ensue when rebellion maintains itself so long and so effectively as to compel between itself, its people and their territory, on the one hand, and the lawful government on the other, an institution and acceptance of the rules and usages which obtain in regular wars between independent nations. Amongst men claiming to have attained a high civilization, war is recognized as a state or condition governed by law. In its conduct or at its close, morality and justice are not lost sight of. If successful, the rebels acquire the power of establishing an independent state, which all men regard as not only legitimate but honorable in its origin; if they fail, the victor may be as indulgent as he will, or as far as he dare may consecrate to his revenge the field of their ruin. Whatever severity can be justified at the bar of public opinion, may be practiced; and certainly no more should be exercised. To the latter proposition every magnanimous spirit will assent. Washington might have failed: Kosciuszko did fail. Trials for treason in the civil courts are not remedies adapted to the close of a great civil war. Honor forbids a resort to them after combatants in open war have recognized each other as soldiers and gentlemen engaged in a legitimate conflict. After they have established truces, exchanged prisoners, and thus made applicable to

their hostile intercourse, the laws of chivalry, based upon an acknowledgment of mutual confidence and respect, the rules and usages of war can not in any event be departed from by either. It would be shockingly indecorous for the ultimate victor in such a conflict to send his vanquished opponent before the civil magistrate to be tried as if he were a mere thief or rioter. No soldier imbued with true sentiments of honor could ever consent to such an act. What honor forbids in an individual, policy prohibits in a government. There would be something inexpressibly revolting and contemptible in the subsequent resort of a great power to measures of resentment on this small, mean scale which it actually feared to employ during the conflict. Other considerations also apply. The civil tribunals have really· no functions suitable to such cases. This is manifest as to the chiefs of the rebellion, and it is an exceedingly rare thing as well as a malignant folly ever to prosecute any others. According to the philosophy of government all punishments are .inflicted by the executive. The judiciary investigates, ascertains guilt or innocence, and advises the executive of the fact. The latter then discharges the accused from bonds or inflicts punishment as the case may require. Strictly speaking, the judicial power, as a branch of the government, has no office in any criminal proceeding except to advise as to the law, and to inform the executive concerning facts not previously known. The facts requiring ascertainment are of course those only which may be deemed private until developed in proof before the investigating tribunals. Concerning acts which have reached such a measure of notoriety that they can not lawfully be gainsaid, judicial investigation or trial is impossible. It is obvious that every material fact in the action of Jefferson Davis against the government was of this public nature. It was known and officially recognized by the government in all its departments, that the war existed and that it had become substantially international in its character, thereby involving consequences of deep moment directly affecting every citizen of the republic. That Jefferson Davis was executive chief of the hostile belligerent, was a fact of similar publicity and in like manner known and acknowledged. All courts were bound to recognize these facts and to declare them. The judges could not have submitted them to a jury, nor could they lawfully have admitted any evidence in denial of them. Pari ratione, they could not have permitted them to be affirmatively proven by the government. Whenever such circumstances must attend them, trial and judgment can only be regarded as a mockery. Neither can be had without a palpable violation of fundamental principles. No reasonable man can deny that courts and juries are instituted only for the normal state of society. They are the civil police, and· their functions are adapted only to the transactions, good and evil, of that condition. When battle is the recognized order of things, the crimes of vanquished combatants are to be condoned or punished according to the law that governs combats. After an open territorial war of this kind had existed for four years, it might be thought by some that the rebels were still simply criminal violators of the municipal law; and that they ought to be dealt with as ·such. By way of reasoning it might be urged that the extent of their operations merely intensified their guilt, and should not in any way affect the question. But this reasoning, if such it may be called, proves too much. On the fall of a rebellious state, after sustaining a belligerent attitude for one hundred years, its chiefs and leaders might, with equal propriety, be brought to trial as traitors in civil courts, although they and their ancestors had for several generations, been uniformly regarded and treated as public enemies carrying on against the ultimate victor a regular national war. This can not be admitted. The law of nature forbids it; and there are broad and comprehensive doctrines deducible from the universal .practice of nations which forbid it. And these doctrines are founded in necessity as well as in reason and justice.

Taking, under positive written law, the narrowest technical view of the subject, one is led to a like result. "Treason," says the constitution, "shall consist only in levying war against the United States or in adhering to their enemies." The latter word means the public enemy, and such enemy himself can not be the traitor. The characters are incompatible. This is a thoroughly established construction; and, consequently, in order to charge the southern confederates with treason under the municipal law it would have been necessary to establish that they were not public enemies in the judicial sense of that phrase, and also that they had levied war against the United States. Neither fact could have been truly asserted. Levying war means setting it on foot. Waging war is ·quite a different thing. It is only in the original conspiracy and in adapting its means to the purposes of active resistance that war can be levied. The offense of treason by levying war, as defined in the ‚constitution, stops there. Subsequent acts may, indeed, sometimes serve to show that this offense has been committed; but those subsequent acts can not have that effect if in themselves they amount to waging a formal regular war by a public enemy and are accepted as such by the government. Practically a contrary conclusion results. Once the lawful government acknowledges the actual existence of public territorial belligerency, and exercises the rights consequent thereon, including the conversion of the opposite party into a public enemy whose acts, as those of a sovereign de facto, are imputable to all within his terri-

tory however innocent, thus impressing upon such persons a hostile character, the preliminary action which may have been treason when it occurred, is divested of that character, and is no longer judicially cognizable as such. It is no longer susceptible of a separate consideration and must thenceforth be regarded only as an introductory step which has become part and parcel of the supervening war thus regularly instituted. Technically it is regarded as an incident merged in the principal transaction. A conflict marked by the features alluded to, is to be deemed a regular and formal public war, because it has been clothed with that character by the government itself. The acts of recognition producing this effect must be imputed to free consent, for a government can not set up duress in avoidance of its deliberate act. Marvellously destitute of self-respect must be the state that could offer such a plea. From the time when actual war has been thus instituted, by mutual consent and recognition, Mars, not Themis, presides over all intercourse between the parties. As before stated, the behests of justice need not remain unfulfilled. The ultimate victor may use his power without ceremony, and inflict upon the vanquished any punishment their faults may merit. His own conception of duty to himself as a responsible member of civilized society is the only restraint upon his will. In drawing the line between a war levied and a war waged, narrow views may lead to the suggestion of some difficulties. Doubtless such might arise but they are not insuperable; nor are great principles, essential to the orderly action of civilized states, to be impugned for such reasons. Peculiar and abnormal cases, whether actually occurring or merely fancied as possible, are never allowed to confound just distinctions. Besides, the southern insurrection presented no such difficulties. It was a clearly defined and officially acknowledged public territorial war. These views induced a belief that Jefferson Davis could not be lawfully convicted of treason, and that to compass his death by means of a civil trial, judgment, and execution, would be disgraceful to those who administered the government and discreditable to our people. Therefore, gentlemen at the north entertaining strong opinions against the right and the act of secession, united in requesting counsel to interpose a defense should anything of the kind be attempted.

On or immediately prior to the thirty-first of May, 1865, it was rumored that Jefferson Davis had been removed from Fortress Monroe to Washington, and was to be there tried upon an indictment for treason. An application to the war department having eventuated in leave to that effect, an open letter tendering professional aid was sent to Mr. Davis. His unsealed reply was regarded as containing some objectionable matter, and was returned to him for correction. He did not alter it; so the tender remained unanswered; and an application by his counsel for an interview was refused on the ground that he was not in civil custody. The next step in the business was a written application by counsel to President Johnson for the discharge of Mr. Davis on bail or on his parol. The letter was properly referred to the attorney-general; but no formal answer to it was ever given. It was subsequently suggested that tendering as sureties some leading men who, during the struggle just closed, had been active and zealous supporters of the government, might facilitate a release on bail. In this exigency, Mr. Greeley consented to become a bondsman. On his suggestion, and, in part at least, by his agency, Commodore Vanderbilt and Mr. Gerrit Smith were induced to unite in the responsibility. At all times subsequently, until Mr. Davis' release, these three gentlemen held themselves in readiness to perform this service.

On the eighth of May, 1866, the circuit court of the United States for Virginia met at Norfolk, UNDERWOOD [District Judge] presiding, and a grand jury was sworn, which presented the following indictment:

"The United States of America, District of Virginia, to wit: In the Circuit Court of the United States of America in and for the District of Virginia, at Norfolk; May Term, 1866. The grand jurors of the United States of America, in and for the district of Virginia, upon their oaths and affirmations respectively, do present that Jefferson Davis, late of the city of Richmond, in the county of Henrico, in the district of Virginia, aforesaid, yeoman, being an inhabitant of, and residing within, the United States of America, and owing allegiance and fidelity to the said United States of America, not having the fear of God before his eyes, nor weighing the duty of his said allegiance, but being moved and seduced by the instigation of the devil, and wickedly devising, intending the peace and tranquillity of the said United States of America to disturb, and the government of the said United States of America to subvert, and to stir, move, and incite insurrection, rebellion and war against the said United States of America on the fifteenth day of June, in the year of our Lord one thousand eight hundred and sixty-four, in the city of Richmond, in the county of Henrico, in the district of Virginia aforesaid, and within the jurisdiction of the circuit court of the United States for the fourth circuit in and for the district of Virginia aforesaid, with force and arms, unlawfully, falsely, maliciously, and traitorously did compass, imagine, and intend to raise, levy, and carry on war, insurrection, and rebellion against the said United States of America, and in order to fulfill and bring to effect the said traitorous compassings, imaginations, and intentions of him, the said Jefferson Davis, afterwards, to wit, on the said fifteenth day of June, in the year of our Lord one thousand eight hundred and sixty-four, in the said city of Richmond, in the county

of Henrico, and district of Virginia aforesaid, and within the jurisdiction of the circuit court of the United States for the fourth circuit in and for the said district of Virginia, with a great multitude of persons whose names to the jurors aforesaid are at present unknown, to the number of five hundred persons and upward, armed and arrayed in a warlike manner, that is to say, with cannon, muskets, pistols, swords, dirks, and other warlike weapons, as well offensive as defensive, being then and there unlawfully, maliciously, and traitorously assembled and gathered together, did falsely and traitorously assemble and join themselves together against the said United States of America, and then and there, with force and arms, did falsely and traitorously, and in a warlike and hostile manner, array and dispose themselves against the said United States of America, and then and there, that is to say, on the said fifteenth day of June, in the year of our Lord one thousand eight hundred and sixty-four, in the said city of Richmond, in the county of Henrico, and district of Virginia aforesaid, and within the jurisdiction of the said circuit court of the United States for the fourth circuit in and for the said district of Virginia, in pursuance of such their traitorous intentions and purposes aforesaid, he, the said Jefferson Davis, with the said persons so as aforesaid traitorously assembled, and armed and arrayed in the manner aforesaid, most wickedly, maliciously, and traitorously, did ordain, prepare, levy, and carry on war against the said United States of America, contrary to the duty, allegiance, and fidelity of the said Jefferson Davis, against the constitution, government, peace and dignity of the said United States of America, and against the form of the statute of the said United States of America, in such case made and provided. This indictment, founded on testimony of James F. Milligan, George P. Scarbury, John Good, Jr., J. Hardy Hendren, and Patrick O'Brien, sworn in open court and sent for by the grand jury. L. H. Chandler, United States Attorney for the District of Virginia."

On the fifth of June, Messrs. James T. Brady, William B. Reed, James Lyons, and Robert Ould, were present at the opening of the court in Richmond as counsel for Mr. Davis. After the usual preliminaries, William B. Reed, Esq., of Philadelphia, then addressed the court as follows: May it please your honor, I beg to present myself in conjunction with my colleagues as the counsel of Jefferson Davis, now a prisoner of state at Fortress Monroe, and under indictment in your honor's court for high treason. We find in the records of your honor's court an indictment charging Mr. Davis with this high offense, and it seemed to us due to the cause of justice, due to this tribunal, due to the feeling of one sort or another, which may be described as crystallizing around the unfortunate man, that we should come at the earliest day to this tribunal and ask of your honor, or more properly, the gentlemen who represent the United States, the simple question, What is to be done with this indictment? Is it to be tried? This is a question, perhaps, which I have no right to ask. Is it to be withdrawn or is it to be suspended? If it is to be tried, may it please your honor, speaking for my colleagues and for myself, and for the absent client, I say with emphasis, and I say it with earnestness, we come here prepared instantly to try that case, and we shall ask for no delay at your honor's hands further than is necessary to bring the prisoner to face the court and enable him, under the statute in such case made and provided, to examine the bill of indictment against him. Is it to be withdrawn? If so, justice and humanity seem to us to prompt that we should know it. Is it to be suspended or postponed? If so, may it please the court, with all respect to your honor and the gentlemen who conduct the business here, your honor must understand us as entering our most earnest protest. We ask a speedy trial on any charge that may be brought against Mr. Davis, here or in any other civil tribunal in the land. We may be now here representing, may it please the court, a dying man. For thirteen months he has been in prison. The constitution of the United States guarantees to him not only an impartial trial, which I am sure he will have, but a speedy trial. And we have come no slight distance; we have come in all sincerity; we have come with all respect to your honor. We have come with strong sympathies with our client, professionally and personally; we have come here simply to ask that question. I address it to the district attorney, or I address it to your honor, as may be the more appropriate—What disposition is proposed to be made with the bill of indictment against Jefferson Davis now pending for high treason?

Major J. S. Hennessey, assistant United States district attorney, said that he had been entirely unaware of the nature of the application just made, and in the absence of the district attorney, Mr. Chandler, he was not prepared to answer the question, but would immediately telegraph to that gentleman the fact of such application having been made. Mr Chandler would probably arrive in Richmond this evening; if he failed to arrive, Major Hennessey stated that he would himself be prepared to answer the question to-morrow morning.

Judge UNDERWOOD (addressing the counsel for Mr. Davis). I am to understand that will be satisfactory?

Mr. Reed. Entirely so.

The court then adjourned.

On the assembling of the court the next day, Judge UNDERWOOD, addressing the assistant district attorney, said: Mr. Hennessey, we are ready to hear from you, whenever it suits your convenience.

Major Hennessey. May it please your honor: As the answer of the government to the questions propounded by Mr. Reed on yesterday are considered of some importance, I have written them out, and propose to read them to the court. May it please your honor, yesterday, Mr. Reed, one of the counsel for Jefferson Davis, propounded certain questions to the court and to me, which, in the absence of Mr. Chandler, I at that time declined to answer. Mr. Chandler is still absent, being, I regret to say, entirely prostrated by a recent domestic calamity, and, as I promised, I to-day proceed to reply to the questions of the learned gentleman. That gentleman correctly says that an indictment has been found in this court against his client, Mr. Davis, and asks if it is to be tried, if it is to be dropped, or is it to be suspended? So far as I am instructed, I believe it is to be tried; but it will not be possible to do so at present, for a variety of reasons, some of which I proceed to give: In the first place, Mr. Davis, although indicted in this court for high treason, is not now, and never has been in the custody of this court, but is held by the United States government, as a state prisoner, at Fortress Monroe, under the order of the president, signed by the secretary of war. In the second place, even if Mr. Davis were in the custody of this court, it would not be possible for the attorney-general, in view of his numerous and pressing engagements at the close of the season, to come here now and try this case—which is a case of great national importance—which he would be expected to do. In the third place, if Mr. Davis is in the delicate state of health suggested by Mr. Reed, it would be nothing less than cruel, at this hot and unhealthy season, to expose him to the unavoidable fatigues of a protracted trial, which appears to be an inevitable result from the array of counsel, present and prospective, engaged for his defense. Neither this court nor any of its officers has any present control over the person of Mr. Davis, and until they have, it becomes impossible for the district attorney to say when he will be tried; but this I assure the gentlemen who represent him here, that the hour Mr. Davis comes into the custody of this court, they shall have full and prompt notice when it is intended to try him, and so far as the district attorney and his associates are concerned, they may be assured their case will have a just and speedy trial, without further let or hindrance. This I say for the special department of the court which I represent; but what the intentions of the government are, with regard to the disposition of Mr. Davis, I am no further instructed than I have said. I now move, may it please your honor, that this court, as soon as the business before it is disposed of, do adjourn until the first Monday of October next. By that time the heat of the summer will have passed away, the weather will be cool and pleasant, and should we have the pleasure of seeing these gentlemen here again, they will be more fitted for the arduous labor which their profession constantly imposes upon them. In the meantime, the crystallization process, referred to by the learned gentleman yesterday, will be going on, and his client will be enjoying the cool breezes of the sea at Fortress Monroe, instead of inhaling the heated and fetid atmosphere of a crowded courtroom.

James T. Brady, Esq., of New York, one of the counsel for Mr. Davis, then said: If your honor please, I did not expect to say one word this morning in reference to the case of Mr. Davis. but some of the suggestions contained in what my learned friend has just read, make it proper for me to state that if Mr. Davis be not technically subject to your honor's jurisdiction, it is only because no copy of this indictment, so far as I am advised, has been served upon him, nor any list of witnesses. nor any act done of those which are required by the statute. It may be true, that in this technical sense he can not now be, and never has been amenable to your authority; but my brother counsel, Mr. Reed, stated that Mr. Davis was not claiming the benefit of any of those wants of forms, but that on the contrary he was here to express, from his own lips, speaking through us, his ardent desire for an immediate trial. Although it may be very hot in Richmond, it is infinitely worse where he is, and so far as the convenience of the counsel is concerned, they care nothing for that convenience, impelled as they are by a sense of duty. From my own experience in the city of Richmond, whose hospitality I have enjoyed certainly, I would be happy to remain here through the heats of summer or the frosts of winter. We can only say that we are entirely ready. We know that we can not control the action of the district attorney. We thank him for his polite response to our questions, and of course we leave the question for such action as the government may think proper to take.

Judge UNDERWOOD. It only remains for the court to say that the district attorney has correctly represented the views of the government upon this matter. The chief justice, who is expected to preside on the trial, has named the first Tuesday in October as the time that will be most convenient for him. The attorney-general has indicated that it would be utterly impossible for him, under the pressure of his many duties, now greatly increased by troubles on the northern frontier, on so short a notice, to give that attention to this great question which it demands. Under all circumstances the court is disposed to grant the motion of the said district attorney, and I think I may say to the counsel that Mr. Davis will in all probability at that time be brought before the court, unless his case shall in the meantime be disposed of by the government, which is altogether possible. It is within the power of the president of the United States to do what he pleases in

these matters, and I presume the counsel for Mr. Davis would probably find it for the interest of their client to make application directly to the government at Washington, but this court would not feel justified in denying at this time the application both of the chief justice and attorney-general. When the court adjourns, it will adjourn not until the next term, which is in November, but until the first Tuesday in October next, as it is supposed from the array of counsel on both sides that have been named it will be a long term, in which great political and constitutional questions are to be discussed and settled, probably taking two months. It would, undoubtedly, be much more comfortable for the counsel as well as Mr. Davis himself, to have these months in the fall rather than in the summer, because it is in every way more comfortable in Richmond at that time than in the summer. I think the counsel is mistaken in supposing that Fortress Monroe is not as comfortable a place in the summer, as Richmond. When I have been there in the summer, I have found the sea breeze very refreshing.

Mr. Brady (to the court). But very limited society.

THE COURT. The society is limited. However, the government is disposed to extend every reasonable privilege, and I am happy to know that the wife of the prisoner is permitted to be with him, and that his friends are permitted to see him. The motion of the district attorney, is therefore granted. This court will adjourn, not until November, but until the first Tuesday in October, which time is preferred by the chief justice and attorney-general. The case will then, if not before disposed of, be taken up.

On the seventh of June the Honorable Charles O'Conor of New York, and Honorable Thomas G. Pratt, ex-governor of Maryland, representing Mr. Davis, and the Honorable James Speed, attorney-general of the United States, waited upon Chief Justice Chase at his residence in the city of Washington to ascertain whether he would entertain an application to release Mr. Davis on bail. On this interview the chief justice furnished the reporter with the following statement:

Mr. O'Conor suggested that such an application might be properly made at chambers in Washington, although out of the district of Virginia in which the indictment had been found, and expressed the hope that it would be entertained, and that bail would be taken.

The attorney-general did not consent to the hearing of the application, but remarked that, if the chief justice was willing to hear it, he would appear on behalf of the government. The chief justice said that whenever it should become apparent, either by the proclamation of the president or by the legislation of congress, or by clear evidence from other sources, that martial law was abrogated and the writ of habeas corpus fully restored in Virginia, he should unite with the district judge in holding the courts in that district. At present, the federal as well as the state courts must act in a quasi-military character, subject to such control by the president and by congress as might be deemed essential to complete pacification and restoration. Such action by a subordinate court might be proper; and the district and circuit courts of the United States for the district of Virginia, could be held by the district judge, subject to such military supervision as should be found needful. He had been, however, of the opinion that neither the chief justice nor any of the justices of the supreme court, exercising, as they did, the highest judicial authority of the nation, could properly join in holding the circuit courts under such circumstances. He was still of this opinion. The president, it was true, had issued a peace proclamation which, in the absence of any action requiring a different interpretation, would probably have warranted the inference that the habeas corpus was fully restored and martial law abrogated in all the states recently in arms against the Union, except Texas. But the proclamation has been followed by other orders from the president through the war department, inconsistent with this interpretation; and in such a matter as this, the executive construction of an executive act ought to be followed. If he were to hold the circuit court in the district of Virginia in the same manner as in the districts in other states,—as, for example, in the districts of Maryland and Delaware,—it would be his duty to issue a writ of habeas corpus on application in behalf of any person in custody within the district, under or by color of authority of the United States, and examine the question of the lawfulness of such custody. If, therefore, an application should be made for that writ in behalf of Jefferson Davis, held as everybody knows in such custody within the district, it would be his duty to issue it. What would be the consequences? If martial law is at an end, the custody is clearly illegal, and the prisoner must be discharged, or admitted to bail, or committed to the state jail or prison of Virginia, under the acts of congress relating to the custody of prisoners. It was manifestly improper, the chief justice thought, for him to interpose in that way with a custody which, upon the supposition that martial law yet exists in Virginia, is purely a matter of military discretion with the president. Under these circumstances the chief justice said he could not, at present, depart from the line of action he had prescribed himself. He could not, consistently with his views of public duty, hold a quasi-military court; nor could he hold a court in any district in a state lately in rebellion, until all semblance of military control over federal courts and their process and proceedings had been removed by the action of the political departments of the government. He did not question, but on the contrary approved, the action of the district

court in holding such courts. Such a court was now being held in Virginia by the district judge. An application to discharge Mr. Davis on bail might very properly be addressed to him: and there was no reason to doubt that, if the government should consent such an order might be made. The district judge, sitting as he did, might carry out the views of the executive made known through the attorney-general. For himself, the same reasons which would restrain him from holding the court, would restrain him even more powerfully from exercising any jurisdiction as a single judge within the district of Virginia; and he must, therefore, decline to entertain the application to admit Mr. Davis to bail.

There was another consideration which would control his present action, even if he felt himself warranted in hold'ng the court. Mr. Davis is now a military prisoner, and not in any sense in the custody of the court. Before an application to discharge on bail could be considered, it would be necessary to inquire into the legality of the military custody, by habeas corpus. An application for that writ, therefore, its allowance and an adjudication that the present custody was illegal, would be indispensable preliminary proceedings; and no application for that writ had been made. He mentioned this objection to the action desired in behalf of Mr. Davis, without thinking it of much importance, for under ordinary circumstances, no doubt, the objection could be easily removed by an application for the writ, and proper proceedings under it. At present the same considerations which would restrain him from acting on an application to discharge on bail, would equally restrain him from the allowance of a writ of habeas corpus.

After these observations, Messrs. O'Conor and Pratt, with the attorney-general, withdrew. No application to admit to bail was made. Although no formal application was made at this time to the chief justice, as appears by his own note of the interview between himself and counsel, such application was made to the government, to know if bail would be received, and the offer of bail was unlimited in amount. Both the president and Mr. Speed evinced favor to the object, and their sincerity can not be fairly questioned. The objection of the chief justice towards exercising judicial functions in territory where military law was superior to civil law, making it out of the question for him to act in the case at that time, Hon. Charles O'Conor and Geo. Shea, Esq., of New York, made a formal motion for bail, before Judge UNDERWOOD, which was heard in the attorney-general's office at Washington, on the eleventh of June, and were replied to by the attorney-general, and on that motion Judge UNDERWOOD delivered the following decision:

I have considered the application made by Mr. Shea, of counsel, to admit Jefferson Davis to bail. Under the circumstances the application might have been more properly made to me when recently holding the circuit court at Richmond. Under the law, it may doubtless be made also in vacation, and I will briefly state my views of it and my conclusions.

In the states which were lately in active rebellion, military jurisdiction is still exercised, and martial law enforced. The civil authorities, state and federal, have been required or permitted to resume partially their respective functions; but the president, as commander-in-chief, still controls their action so far as he thinks such control necessary to pacification and restoration. In holding the district and circuit courts of Virginia, I have uniformly recognized this condition.

Jefferson Davis was arrested under a proclamation of the president, charging him with complicity in the assassination of the late President Lincoln. He has been held ever since, and is now held, as a military prisoner. He is not, and never has been, in the custody of the marshal for the district of Virginia, and he is not, therefore, within the power of the court. While this condition remains, no proposition for bail can be properly entertained, and I do not wish to indicate any probable action under the circumstances.

On the tenth of April, 1866, a resolution had been introduced by Mr. Boutwell, of Massachusetts, instructing the judiciary committee of the house of representatives to inquire whether there is probable cause to believe in the criminality alleged against Davis and others, and whether any legislation is necessary to bring them to a speedy and impartial trial. This committee had the case under investigation until they made their report, with the following conclusions:

"When the committee entered upon this investigation in April last, the evidence in the war department, if accepted as true, was conclusive as to the guilt of Jefferson Davis. The judge-advocate-general had taken the affidavits of several persons who professed to have been in the service of the rebel government, and who had been present at an interview between Surratt, Davis, and Benjamin. Those affidavits were taken by the judge-advocate-general in good faith, and in the full belief that the affiants were stating that only which was true. The statements made by those witnesses harmonize in every important particular with facts derived from documents and other trustworthy sources. The committee, however, thought it wise to see and examine some of the persons whose affidavits had been taken by Judge Holt. Several of the witnesses when brought before the committee retracted entirely the statements which they had made in their affidavits, and declared that their testimony, as given originally, was false in every particular. They failed, however, to state to the committee any inducement or consideration

which seemed to the committee a reasonable explanation for the course they had pursued. And the committee are not at this time able to say, as the result of the investigations they have made, whether the original statements of these witnesses are true or false, but the retraction made by some of them deprives them of all claim to credit, and their statements so far impeached or thrown out upon the evidence given by other witnesses whose affidavits were taken by Judge Holt, that the committee, in the investigations they have made and in the report, have disregarded entirely the testimony of all those persons whose standing has been so impeached. The committee are of opinion that it is the duty of the executive department of the government, for a reasonable time, and by the proper means, to pursue the investigations for the purpose of ascertaining the truth. If Davis and his associates are innocent of the great crime of which they were charged in the president's proclamation, it is due to them that a thorough investigation should be made, that they may be relieved from the suspicion that now rests upon them. If, on the other hand, they are guilty, it is due to justice, to the country, and to the memory of him who was the victim of a foul conspiracy, that the originators should suffer the just penalty of the law. The committee are of the opinion that the work of investigation should be further prosecuted; and, therefore, in conclusion, they recommend the adoption of the following resolutions: 'Resolved, that there is no defect or insufficiency in the present state of the law to prevent or interfere with the trial of Jefferson Davis for the crime of treason, or any other crime for which there may be probable ground for arraigning him before the tribunals of the country. Resolved, further, that it is the duty of the executive department of the government to proceed with the investigation of the facts connected with the assassination of the late President Abraham Lincoln without unnecessary delay, that Jefferson Davis and others named in the proclamation of President Johnson, of May second. 1865, may be put upon trial and properly punished if guilty, or relieved from the charges if found to be innocent.' "

No action having taken place, the following correspondence ensued:

"Executive Mansion, Washington, D. C., October 6th, 1866. Sir: A special term of the circuit court of the United States was appointed for the first Tuesday of October, 1866, at Richmond, Va., for the trial of Jefferson Davis on the charge of treason. It now appears that there will be no session of that court at Richmond during the present month, and doubts are expressed whether the regular term (which by law should commence on the fourth Monday of November next) will be held. In view of this obstruction, and the consequent delay in the proceeding with the trial of Jefferson Davis under the prosecution for treason, now pending in that court, and there being, so far as the president is informed, no good reason why the civil courts of the United States are not competent to exercise adequate jurisdiction within the district or circuit in which the state of Virginia is included, I deem it proper to request your opinion as to what further steps, if any, should be taken by the executive with a view to a speedy, public, and impartial trial of the accused, according to the constitution and laws of the United States. I am sir, very respectfully, yours, Andrew Johnson. To the Hon. Henry Stanbery, Attorney-General."

Reply of the attorney-general:

"Attorney-General's Office, Oct. 12, 1866. The President—Sir: I have the honor to state my opinion, on the question propounded in your letter of the 6th, as to what further may be proper or expedient to be done by the executive, in reference to the custody of Mr. Davis, and the prosecution for treason now pending against him in the circuit court of the United States for Virginia. I am clearly of opinion, that there is nothing in the present condition of Virginia to prevent the full exercise of the jurisdiction of the civil courts. The actual state of things, and your several proclamations of peace and of the restoration of civil order, guarantee to the civil authorities, federal and state, immunity against military control or interference. It seems to me, that in this particular there is no necessity for further action on the part of the executive, in the way of proclamation, especially as congress, at the late session, required the circuit court of the United States to be held at Richmond, on the first Monday of May, and the fourth Monday of November in each year, and authorized special or adjourned terms of that court to be ordered by the chief justice of the supreme court, at such time and place, and on such notice, as he might prescribe, with the same power and jurisdiction as at regular terms. This is an explicit recognition by congress, that the state of things in Virginia admits the holding of the United States courts in that state. The obstructions you refer to, it seems to me, can not be removed by any executive order, so far as I am advised. It arises as follows: Congress, on May 22, 1866, passed an act providing that the circuit court of the United States for the state of Virginia should be held at Richmond, on the first Monday of May, and on the fourth Monday of November in each year; and further providing that all suits, and other proceedings which stand continued to any other time and place, should be deemed continued to the time and place prescribed by the act. The special or adjourned session which was ordered by the court to be holden at Richmond, in the present month of October, was considered as abrogated by force of this act. This left the regular term to be holden on the fourth Monday of November, and if there had been no further legislation by congress, no doubt could exist

as to the competency of the chief justice and the district judge of that court then to try Mr. Davis. But on the twenty-third of July, 1866, congress passed an act to fix the number of judges of the supreme court of the United States, and to change certain judicial circuits. [14 Stat. 209.] Among other changes in the circuits made by this act, is a change of the fourth circuit, to which the chief justice has been allotted. As this circuit stood prior to this act, when allotted to the chief justice, it embraced Delaware, Maryland, Virginia, North Carolina, and West Virginia. It was changed by this act by excluding Delaware and adding South Carolina. It is understood that doubts exist whether the change in the states composing the circuit, will not require a new allotment. Whether these doubts are well founded or not, it is certain that the executive can not interfere, for although, under peculiar circumstances, the executive has power to make an allotment of the judges of the supreme court, yet these circumstances do not exist in this case. A new allotment, if necessary, can only be made by the judges of the supreme court, or by congress—perhaps only by congress. Mr. Davis remained in custody at Fortress Monroe, precisely as he was held in January last, when, in answer to a resolution of congress, you reported communications from the secretary of war and the attorney-general, showing that he was held to await trial in the civil courts. No action was then taken by congress in reference to the place of custody. No demand has since been made for his transfer into civil custody. The district attorney of the United States for the district of Virginia, where Mr. Davis stands indicted for treason, has been notified that the prisoner would be surrendered to the United States marshal upon a certain capias under the indictment, but the district attorney declines to have the capias issued, because there is no other place within the district where the prisoner could be kept, or where his personal comfort and health could be so well provided for. No application has been made within my knowledge by the counsel for Mr. Davis for a transfer of the prisoner to civil custody. Recently an application was made by his counsel for his transfer from Fortress Monroe to Fort Lafayette, on the ground of sanitary consideration. A reference was promptly made to a board of surgeons, whose report was decidedly averse to change, on the score of health and personal comfort. I am unable to see what further action can be taken on the part of the executive to bring the prisoner to trial. Mr. Davis must for the present remain where he is, until the court which has jurisdiction to try him shall be ready to act, or until his custody is demanded under lawful process of the federal courts. I would suggest that, to avoid any misunderstanding on the subject, an order be issued to the commandant of Fortress Monroe to surrender the prisoner to civil custody, whenever demanded by the United States marshal, upon process from the federal courts. I send herewith a copy of a letter from the United States district attorney for Virginia, to which I beg to call your attention. I have the honor to be, &c., Henry Stanbery, Attorney-General."

"Office United States District Attorney for Virginia. Norfolk, October 8th, 1866. Honorable Henry Stanbery, Attorney-General of the United States: Sir: In compliance with your request, I submit herewith the substance of the verbal statement I made you a few days since in answer to your question, 'Why no demand has been made upon the military authorities for the surrender of Jefferson Davis, in order that he might be tried upon the indictment found against him in the United States circuit court at the term held at Norfolk in May last.' Two reasons have influenced me in not taking any steps for removing him from their custody. The one relates to the safe keeping; the other to his own personal comfort and health. I have never had any doubt but that he would be delivered to the United States marshal of the district, whenever he should have demanded him on a capias or other civil process. But you can readily understand that so soon as he goes into the hands of that officer, upon any action had by me, his place of confinement would be one of the state jails of Virginia. At Fortress Monroe all necessary precautions can be and are taken to prevent his escape. Over the internal police of a state jail the marshal has no authority, and the safe custody of the prisoner could not be secured save at a very great expense. Mr. Davis is now in as comfortable quarters as the most of those occupied by the army officers at the fort. The location is a healthy one. His family have free access to him. He has full opportunity for exercise in the open air. If his health be feeble, remove him to one of the state jails, and his condition, instead of becoming better, would in all these respects be much for the worse. His counsel probably understood all this, and I think, will not be likely to take any steps which would decrease the personal comforts or endanger the life of their client. I have the honor to be, most respectfully, your obedient servant, L. H. Chandler, United States District Attorney for Virginia."

In June, 1866, Mr. Greeley visited Washington, and also Judge Underwood at Richmond, and actively co-operated in the effort then made, but it was unsuccessful; the cause can only be conjectured.

In August, 1866, Mr. Davis' counsel solicited his removal to some northern prison as a measure calculated to benefit his health, which was then precarious. An investigation at Fortress Monroe by two army surgeons specially selected and sent from Washington for the purpose, resulted in a report that the removal was inexpedient. If allowed, it might have led to an early release of Mr. Davis on

bail. Up to this time there seemed some influence—some "power behind the throne"—that kept its eye upon Mr. Davis and vetoed all attempts in his favor. Nine months more elapsed before his release. That event occurred May thirteenth, 1867. Mr. Greeley and Mr. Smith then attended in person at Richmond. Together with Commodore Vanderbilt, they signed the recognizance. Though no direct promise was ever made, Mr. Stanbery, the attorney-general, and Mr. Evarts, his associate, intimated shortly prior to this May circuit at Richmond, that the government would accept bail. Mr. Evarts attended at Richmond on behalf of the prosecution and assented accordingly. Why bail was not accepted in June, 1866, or earlier, and was accepted in May, 1867, is not known. The same persons were offered on both occasions. In 1866, Mr. Davis was ready to give bail in one million dollars; or more, if required; in 1867, bail was not demanded for even one-tenth of that sum. Mr. Greeley's frank liberality in becoming one of the sureties, and procuring other influential persons to unite with him, was most praiseworthy. In subsequently advising a general amnesty, and actively following it up by an immediate discontinuance of all pending prosecutions, Mr. Attorney-General Evarts entitled himself to the applause of all good men.

The events detailed above, thus spread themselves over nearly the whole of the year, in efforts by his friends to procure a prompt trial or release of Mr. Davis, or inquiries of the executive as to why he had not been or was not about to be tried, or investigations by the congress of the United States, as to whether the charges against him had any foundation, and why they were not subjected to the test of judicial investigation. The controversy raged as to whether the war had ended, and whether the laws in the southern states were superior to the military arm of the government. The president and the supreme court held or clearly intimated that peace prevailed in all those regions recently within the belligerent lines of the Confederacy, and that therefore law was and must be supreme. Congress held that the status of war still remained, and by a series of legislative acts, assumed command of the army, and through it exercised military law over all those states and people. It placed states under the command of its generals, who were authorized to execute the laws, and who assumed and exercised the power to make them; who suspended, extended, amended, and repealed laws at their will and pleasure, by general orders issued by their adjutants-general, and appointed their own staff officers to act as judges of state courts, paying them salaries out of the state treasury, which the law provides alone for independent judges, while such officers also received their regular pay, as part of the army of these United States. These generals commanding, not only made the laws and appointed their own subordinates to interpret, apply, and execute them, but in many instances they directed in special orders what decisions should be made, and what judgments rendered in specific cases. They were the executive, the legislative, and the judicial departments of government concentrated into one hand, under what is known historically as the "reconstruction measures of congress." In Virginia the president judge of the supreme court of appeals was a staff officer of the general commanding, assigned to that duty; and another one of the judges of that court was an officer of the federal army, receiving his appointment from the same source.

While affairs were in this condition, Chief-Justice Chase refused to sit within the jurisdiction in which a soldier was the ultimate arbiter, and a bayonet the sole symbol of law. The circuit court of the United States for Virginia was however held, having had a brief term in November, 1866, and in May, 1867, the district judge (UNDERWOOD) opened its regular term at Richmond. On the first day of the court and of the month, the following petition was presented to him:

"To the Honorable the Judges of the Circuit Court of the United States for the District of Virginia. The petition of Jefferson Davis, by George Shea, his attorney in fact in this behalf, respectfully showeth: That he is, and ever since the nineteenth day of May in the year 1865, has been restrained of his liberty, and held in close custody as a prisoner in jail in that certain strong place of, and belonging to the government of the United States, called Fortress Monroe, within the said district of Virginia, and that Brigadier-General Henry S. Burton is now the commander of said Fort Monroe, and as such holds petitioner in his custody. That no ground of detention is alleged to the knowledge of your petitioner, or his said attorney, in fact, unless it be a certain indictment presented against your petitioner at the May term of the above entitled court, held in the year 1866, of which a copy is hereunto annexed, marked A. Your petitioner further shows that the May term was adjourned to meet at Richmond on the fourth day of June, in the year last aforesaid. That at said adjourned term your petitioner appeared by his counsel and urged a trial at said adjourned term, offering to proceed without delay, but that the government declined to proceed on said indictment. Your petitioner shows that at the subsequent term of this court your petitioner appeared in like manner, but the government did not bring on the trial. Your petitioner further shows that his imprisonment aforesaid has greatly impaired his health, and that the continuance thereof through the ensuing summer would involve serious danger to his life, as your petitioner believes. Your petitioner further says that ample sureties for his appearance to abide judgment on said indictment can be given, if your peti-

tioner shall be admitted to bail. Your petitioner further shows that his detention, imprisonment, and custody aforesaid, always have been and are exclusively under or by color of the authority of the United States, and that he has reason to apprehend that the government may not proceed to the trial on said indictment at the next ensuing term of said court, which is to be held in Richmond on the first Monday of May, 1867. Whereupon your petitioner prays that a writ of habeas corpus may issue from this honorable court to be directed to Brigadier-General Henry S. Burton aforesaid, and whomsoever may hold your petitioner in custody, commanding him or them to have the body of your petitioner before the circuit court of the United States for the district of Virginia, on the first Monday of May, 1867, at the opening of court on that day, or at such other time as in the said writ may be specified, for the purpose of inquiring into the cause of the commitment and detention of your petitioner, and to do and abide such order as this court may make in the premises. And your petitioner will ever pray. Jefferson Davis, by George Shea, his attorney in fact.

"United States of America, District of Columbia, ss.: George Shea, being duly sworn, says that he is attorney in fact for the petitioner in the preceding petition named; that he is acquainted with the said petitioner, and saw him in close custody, as a prisoner, in Fort Monroe, in the month of March last; that he, this deponent, has a general knowledge of the facts in the above petition stated, and that he verily believes the said petition to be in all respects true. George Shea.

"Subscribed and sworn before me, this first day of May, 1867, at Alexandria, Va. John C. Underwood, District Judge."

And thereupon the following writ was granted:

"The President of the United States to Brigadier-General Henry S. Burton, and to any person or persons having the custody of Jefferson Davis, greeting: We command that you have the body of Jefferson Davis, by you imprisoned and detained, as it is said, together with the cause of such imprisonment and detention, by whatsoever name the said Jefferson Davis may be called, or charged, before our circuit court of the United States for the district of Virginia, at the next term thereof at Richmond, in said district, on the second Monday in May, 1867, at the opening of the court on that day, and so do and receive what shall then and there be considered concerning the said Jefferson Davis. Witness, Salmon P. Chase, our Chief Justice of the Supreme Court of the United States, this first day of May, 1867. W. H. Barry, Clerk of the Circuit Court of the United States, District of Virginia."

By order of the president, the following order was issued:

"War Department, Washington, D. C., May 8, 1867. Brevet Brigadier-General H. S. Burton, United States Army, Commanding Officer at Fortress Monroe: The president of the United States directs that you surrender Jefferson Davis, now held confined under military authority at Fortress Monroe, to the United States marshal or his deputies, upon any process which may issue from any federal court in the state of Virginia. You will report the action taken by you on this order, and forward a copy of the process served upon you to this office. By order of the president: E. D. Townsend, Assistant Adjutant-General."

On the tenth day of May the writ was served on General Burton by the marshal, and, in obedience to the command thereof, he took Mr. Davis to Richmond, and on the 13th made the following return of the writ, producing at the same time the body in court:

"In obedience to the exigency of the within writ I now here produce before the within named circuit court of the United States for the district of Virginia, the body of Jefferson Davis, at the time of the service of the writ held by me in imprisonment at Fortress Monroe, to the military authority of the United States subject, and surrender of the said Jefferson Davis to the custody, jurisdiction, and control of the said court, as I am directed to do by the order of the president of the United States, under date of May 8, 1867. H. S. Burton, Colonel and Brevet Brigadier-General of the United States Army."

Mr. Chandler, for the government, said: General Burton, comes into court to present his return, produces the body of Jefferson Davis, hitherto held by the military authorities, and hereby submits him to the control and authority of this court, as he had been commanded to by the president of the United States.

Mr. O'Conor said: On this return, may it please your honor, no question arises as to the legality of the former imprisonment. We are advised that there is an indictment against the prisoner in this district, and that your honor will take such course as may be proper in the case.

THE COURT replied: The return is explicit and satisfactory. General Burton receives the thanks of the court for his prompt and graceful obedience to its writ. General Burton is now honorably relieved of the custody of the prisoner, who passes into the custody of the court, under the protection of American republican law. The marshal will now serve on the prisoner the writ on the indictment now in this court.

Deputy-Marshal Duncan advanced and handed a paper to Mr. Davis, who arose and handed it to Mr. O'Conor.

Mr. O'Conor said: We hope that the court will now order such proper course as justice may require. No further action could be asked by the counsel of Mr. Davis. and it remaining with the court to institute regular civil proceedings, he would acknowledge to have received a copy of the indictment, and

would wish to know what further steps would be taken.

Judge UNDERWOOD said: The court would be pleased to hear from the representatives of the government.

Mr. Evarts. I deem it proper to say that I represent the government on this occasion and in this prosecution, in association with my learned friend the district attorney, Mr. Chandler. Mr. Davis having passed from military imprisonment to the control and custody of this court, and as an indictment is pending against him and he is now under arrest, it only remains for me in behalf of the government to say, it is not its intention to prosecute the trial of the prisoner at the present term of the court.

Mr. O'Conor. The condition of the case throws upon us the duty of presenting to your honor's consideration some of the circumstances attending it. Jefferson Davis has been imprisoned and in the power of the government, so that any steps thought expedient, just, and consistent with sound policy, might have been taken against him a very long time ago. His imprisonment commenced on the 19th of April, 1865. In this court an indictment was presented against him in May, 1866. Mr. Davis has been at all times since his imprisonment, and particularly during the last year or more of that imprisonment, exceedingly anxious to meet the questions arising on any indictment which might be presented. He was exceedingly anxious to receive the advantages, and enjoy the rights which your honor has so eloquently and justly eulogized in the address made with reference to General Burton—the blessings and advantages of a just, equal, fair, and I may say, benign (for that becomes the occasion) administration of law. No particular civil procedure has been on foot since the indictment was presented, and although the whole period of two years has elapsed since the commencement of his imprisonment, an application of obvious general principles and policy was properly made to the court, while, at the same time, securing due responsibility to aw and the ends of justice, to mitigate somewhat the prisoner's condition; for all imprisonment, and the holding of the accused for trial, are adopted for the purpose of securing an answer and the personal appearance of the accused when the question of his guilt or innocence comes fairly before the court. This is ample reason on general grounds. The constitution of the United States, which we all profess to reverence, assures a speedy trial. But I do not come here to assert that a speedy trial means instantly, nor to assert that the government has not on this, as on all other occasions, had a reasonable time to prepare for trial. I do not assert that considerations of policy and convenience may not have had their full weight, although they may bear oppressively on the individual. I do not complain that the government has failed to prosecute last year, or deferred action until the present year. I have no such purpose, because we are bound to respect the authority of the president, the attorney-general, and their associates and advisers, and only suppose there are public considerations for not proceeding with the trial immediately. But, if your honor please, it is a fact that a gentleman, not very young, and not very remarkable for constitutional vigor—whatever may be said of his mental vigor, has already suffered two years of imprisonment, and it is a fact that, as far as human guarantees can be given for any man, I might say any amount of security for the appearance of the prisoner can be furnished. We can furnish such pledges from gentlemen in every part of the country, of every party, and representing every shade of opinion; gentlemen who, becoming security for him, would profess but one sentiment, and that not for him personally, who are averse to the political views which have distinguished his life in every respect, but who, nevertheless, feel a great interest in the honor and dignity of the American people, and in the American republic, and fear that the punishment of death, in the absence of a trial, would result from his longer imprisonment. I say, then, this kind of assurance can be given; and as that class who differ so widely in opinion are willing to give this security, in order to show their respect for him personally, it furnishes the best proof that they believe he will appear before you whenever required. To this they are willing to pledge their whole estates. These remarks are to express to your honor that we are ready to give bail that at a future day Mr. Davis will be ready to appear, without in the meantime being held a prisoner. Fair, reasonable bail, such as may be exacted in ordinary cases, we are now ready to furnish. As the trial must lie over the ensuing summer—as the prisoner has not necessarily to be examined or defended in any way—he is now subject to judicial control, and the question for your honor is, whether the prisoner shall be let to bail, as the learned gentleman proposes. If your honor so determines, then the question arises as to the amount, and the terms, and the division, if desired, on which the security may have been much reduced by imprisonment. I move your honor to accept bail for him. This you will of course do, either on your own judgment or on consultation with other officers of the government as to the amount. I have spoken on the pains of imprisonment. Every freeman will understand that any imprisonment of a freeborn American must carry oppression with it, so far as there was a long period of imprisonment. Certainly, during the time Mr. Davis was under the direction and custody of that gallant officer to whom you paid so just a compliment, that imprisonment has had as few pains and as little suffering as could be expected under the circumstances. He was

in the hands of a soldier and a gentleman. I do not allude to other times, but speak as to what is before us. Jefferson Davis is now here, under your exclusive direction, and I ask that he have the liberty of free locomotion until you are prepared to try him.

THE COURT said it would like to hear from the other side.

Mr. Evarts. The imprisonment was under the military authority and jurisdiction of the United States. Its duration, or the circumstances attending it, are to be taken. The indictment, I am informed, is under a recent act of congress prescribing the punishment for treason, passed in 1862, and which, for the first time in our legislation, has made it proper for the court to inflict less than the death penalty for the crime. Undoubtedly the government, in saying to your honor that they do not propose proceeding against the prisoner during the present term, have presented a proper case for the motion of his counsel; and it is for your honor to determine on the usual terms, in the discretion of the court, considering all the circumstances of the case as to the propriety of receiving bail. The court has nothing to do with the characters or motives of the sureties; it could only look to what the law requires with regard to pecuniary responsibility, and for insuring the presence of the accused. I do not know that there will be any indisposition on the part of the prisoner's counsel to meet the amount of bail your honor or the district attorney may think suitable. Indeed, from the remarks of the prisoner's counsel, they have the ability and disposition to furnish the requisite security. As to the question of amount, it is for your honor to say what was the proper sum in order to the proper administration of justice.

Mr. Chandler, Dist.-Attorney. The question now presented is, whether the prisoner shall be admitted to bail. The judiciary act of 1789 provides that the supreme court or a judge of a district court of the United States, may, in any case, even in capital punishment, taking into consideration all the circumstances, admit to bail, exercising a sound discretion. If an indictment was found against the prisoner under a law by which he could not be punished with death, then, as a matter of right, he could give bail. I will state what I think to be a fair amount of bail, and do so the more freely because there has been some consultation in this matter. I believe the learned counsel associated with me will agree to ask bail in the sum of one hundred thousand dollars. I presume there will be no question as to the amount of bail; it would be as easy a question to determine on that amount as on ten thousand dollars. Something has been said about gentlemen from all parts of the country, representing all shades of politics, willing to enter surety for the appearance of the prisoner at the next term. So far as suretyship is concerned, we have no ob-

jection to take them, but I feel I owe a duty to the government in asking, in addition to gentlemen residing outside of this district, that gentlemen residing in this district shall also enter into security, in order to secure the attendance of the prisoner at the next term.

Mr. O'Conor. We can meet that question as to bail.

Mr. Chandler. That is in the discretion of the court. I may remark, in order to avoid embarrassment in the future, that the government would run no risk by requiring some of the sureties to be residents of this district; while, on the contrary, we would be certain, in case of non-attendance, without having to enter suit in a different jurisdiction, to hold the sureties responsible for the non-appearance of the prisoner.

Mr. O'Conor. On a question of residence there need be no difficulty. We will give those who will respect their obligations.

Mr. Evarts. We have no objections, provided the surety is adequate.

Mr. O'Conor. There are ten gentlemen willing to go security ten thousand dollars each.

UNDERWOOD, [District] Judge. The question is whether the offense is bailable. It is a little remarkable that in the midst of a gigantic civil war, the congress of the United States changed the punishment of an offense from death, to fine and imprisonment [Act July 17, 1862]; but under the circumstances it was very honorable to the government of the United States, and exhibited clemency and moderation. This is a fact which relieves the present case of every doubt as to its being bailable, and it is also in my judgment eminently proper that the motion should be treated with favor, as the defendant has been ready for a year to submit his case to the courts of the country. It is true the prisoner has not until to-day been in the custody of this court. I think, however, no person acquainted with the circumstances of the country, would suppose the fact reflected on the justice of the government, considering the national effect of a great war, which lashed all elements of society into a fury. It was not to be expected the passions and prejudices aroused would be subdued in a moment, and it is in consequence of the prevalence of the disturbance and tumult which have been abroad in the community, that the government felt that it was not safe to proceed with the case. After consultation with higher judicial officers, it was thought best to omit the trial last fall, but fortunately we have a more agreeable aspect at the present time. We may now hope for restored confidence, and that we may not be disturbed by violence and commotion. I think there are reasonable assurances in the indications around us, that we are about to enter on a peace more permanent than ever existed before. I ought, perhaps, to state the fact that this court expects to be in session all this week;

and I have received a letter from Chief Justice Chase, intimating his intention to come to this city if any important cases are likely to be tried. I ought, perhaps, also to say, in justice to the district attorney, that he expected to dispose of this case during the present term. I believe he was fully prepared for the final disposition of it at this time, but I have no doubt that the grave considerations have induced the government to take a different course. So it seems the responsibility of the trial is with the government, and not with the court, or the district attorney, and no doubt for good and proper reasons. The government can not complain, since the delay is its own. I am glad counsel have agreed on the amount of bail. It meets with the approbation of the court, which will not confine the sureties to the district of Virginia. It would no doubt be satisfactory if about one half of the sureties be confined to the state of Virginia. There is no objection to having the remainder of the bail from other portions of the United States. I would inquire of the counsel for the prisoner, whether his sureties are present to enter into cognizances to-day.

Mr. O'Conor. They are all prepared.

THE COURT. The gentlemen proposing to offer themselves will please come forward.

The names of the sureties were severally called, and they repaired to the clerk's desk and signed the following paper:

"Be it remembered that, on this second day of May, A. D. 1868, before the honorable the circuit court of the United States for the district of Virginia, at the court-house in Richmond, in the said district, came Jefferson Davis and acknowledged himself to owe to the United States of America the sum of one hundred thousand dollars, lawful money of the said United States, and Gerrit Smith, Horace Greeley, and Cornelius Vanderbilt, each of whom acknowledged himself to owe to the United States of America the sum of twenty-five thousand dollars each, of like lawful money, and William H. McFarland, Isaac Davenport, Jr., Abraham Warwick, Gustavus A. Myers, William W. Crump, James Lyons, John A. Meredith, James Thomas, Jr., Thomas R. Price, and Thomas W. Boswell, each of whom acknowledged himself to owe to the said United States of America, the sum of twenty-five hundred dollars each, of like lawful money. The said several sums to be made to the use of the said United States of the goods, chattels, lands, and tenements of the said parties respectively. The condition of this recognizance is such that if the said Jefferson Davis shall in proper person, well and truly appear at the circuit court of the United States for the district of Virginia, to be held at Richmond, in the said district on the fourth Monday of November next, at the opening of the court on that day, and then and there appear from day to day, and stand to abide and perform whatever shall be then and there ordered and adjudged in respect to him with said court, and not depart from the said court without leave of the said court in that behalf first had and obtained, then the said recognizance to become void, otherwise to remain in full force. Taken and acknowledged this thirteenth day of May, 1867. Jefferson Davis. Horace Greeley, New York. Augustus Schell, New York. Aristidus Welsh, Philadelphia. David K. Jackman, Philadelphia. W. H. McFarland, Richmond. Richard Barton Haxall, Richmond. Isaac Davenport, Richmond. Abraham Warwick, Richmond. Gustavus A. Myers, Richmond. William W. Crump, Richmond. James Lyons, Richmond. John A. Meredith, Richmond. William H. Lyons, Richmond. John Minor Botts, Virginia. Thomas W. Boswell, Virginia. James Thomas, Jr., Richmond."

THE COURT. The marshal will discharge the prisoner.

The marshal did so, when deafening applause followed.

The November term of the court commenced on the 26th day of November, where, after the swearing in of the grand jury, and the charge of the court to them, Judge UNDERWOOD indicating a desire to hear from the gentlemen of the bar any motion they might have to make,

Mr. Evarts, of New York, on behalf of the government, said: · If the court please, the case of the United States against Jefferson Davis, which was called at the last term of the court, when the accused was put under recognizance for the attendance at this term, is now to be brought to your honor's notice. I observe the counsel of Mr. Davis in attendance; and I understand that the prisoner is obedient to the requisitions of the court at any time. The intention of the government in regard to that case is to proceed with the trial of it at some time during the present term of the court, and the considerations upon which the day would be fixed would be but twofold: First, as to the readiness of the government in regard to the production of their proofs, and the attendance of witnesses, which, however, would not require any considerable postponement of the trial from the present day. But there is another consideration, and that is, at what time during the present term the public duties of the chief justice of the United States supreme court would permit of his presiding with his honor, the district judge, at the trial in this circuit. It is understood that his public duties at Washington during the session, which is to commence on next Monday, will preclude his attendance at this trial, and the government propose, therefore, to name a day which will be in the expected order of business in the supreme court of the United States, after the adjournment of that court, and then to proceed with the trial. As the counsel are in

attendance, and as the prisoner is in attendance upon the orders of the court, it is proper that they should both be relieved from any unnecessary inconvenience, and that the counsel of the government should also understand what call will be made upon them for attendance here. I propose, therefore, if your honor please, that some day, say the third Wednesday of March, be assigned for the trial.

Judge UNDERWOOD. Do I understand that that is the assent for the counsel for the defense?

Mr. Evarts. I understand that they have no objection to that course, but the counsel will speak for themselves.

Mr. O'Conor, on behalf of the counsel for Mr. Davis, replied, that they were in attendance, and had no desire to express with reference to the ordinary progress of business, except that it should be conducted in that manner most likely to be attended with the least embarrassment and inconvenience to the defendant and his numerous friends, and to his counsel. They felt themselves bound to render such assistance as might be necessary in securing to him a fair, full hearing. Their personal wishes and convenience would have been greatly promoted by a trial when Mr. Davis was first brought before the court, in May last; and in a greater degree was it true that their personal wishes and convenience would be consulted by proceeding at this time. He was apprehensive that the term of the supreme court might continue beyond the time now indicated for the trial, and that, as a consequence, it would be impracticable for the chief justice to be here. In that contingency, the defendant and his counsel would be subjected to a renewal of the inconvenience which they had been compelled to suffer, and had suffered uncomplainingly on two occasions. However, he found no fault with the government in its disinclination to proceed in the absence of the chief justice. It was undoubtedly desirable, in view of all the interests involved, that two judges should preside when the case is heard. He conceded that the higher duty, so to speak, of the chief justice to be present in the supreme court of the United States, and there to preside, prevented him from being present and giving his attendance to this case at this time. He would have been pleased, as would also his associates, in this doubtful state of affairs, to have renewed the recognizance of his client for an appearance in the month of May, when the chief justice could certainly attend; but, not having any control over the matter, the defense had only to ask that a formal order be entered to the effect that Mr. Davis was relieved from attendance, and had leave to depart from the court until the day named.

Mr. Evarts remarked that it would be quite as inconvenient for the government and its counsel to be unable to proceed at the adjourned day, as it could be to the prisoner and his advisers. He suggested, that by being able to form a timely anticipation as to whether the day named would be such, in view of the actual course of the business of the supreme court, as to permit of the attendance of the chief justice here, the danger of the result which had been indicated might be guarded against. If circumstances then appearing should render it unsuitable for the chief justice to be expected here in time to go on with the trial, it could very easily be arranged that the attendance of Mr. Davis at a still later day in the present term should coincide with the commencement of the new term of the court, so as not to make any practicable difference. But he anticipated that the government would be able to proceed, and that the chief justice would be able to attend in time to dispose of the case at the present term of the court. It would, moreover, probably better suit the convenience of all parties to be present in the early spring for a somewhat prolonged period, than during mid-summer, if it should be a protracted trial.

Judge UNDERWOOD expressed entire acquiescence in the arrangement proposed on the part of the government, as the presence of the chief justice in the trial of the cause was essential upon various grounds. He approved of the suggestion of the counsel, looking to an understanding by which an attendance of witnesses and counsel might not be required until the trial was to proceed on the day appointed. He believed it to be due to the defendant that two judges should preside at the trial, as in that case the defendant would have the advantage of appeal to the higher court, in case of a disagreement between the judges upon any important question. The proposition on the part of the government, and assented to by defendant's counsel, was agreeable to the court, and the order proposed by defendant's counsel would be entered.

Some further remarks were made by counsel in regard to the possible necessity of the removal of the leave of absence given to Mr. Davis, and his being held on his recognizance, in the event of the trial of the cause being informally postponed from the time fixed to a more distant day.

Mr. Evarts said that if, for instance, on the tenth of March, it should be known that the supreme court would prolong its session into April, then if this court, on the motion of the district attorney, and with the attendance of Mr. Davis' counsel resident in Richmond, would make another order, that the defendant attend on the tenth day of May, for instance, all would be regular, the recognizance would be binding, and no inconvenience would arise.

Judge UNDERWOOD replied that the court would take care of the rights of the defendant, and suggested that the necessary order in the case should be drawn by the counsel.

The following order of the court was then agreed upon by the counsel on both sides:

"The United States v. Jefferson Davis. The counsel having been heard in this case for the United States and for the defendant, it is now ordered that defendant have leave to depart hence until the fourth Wednesday of March next, at ten o'clock in the forenoon of that day, at which day and hour he is required personally to be and to appear in this court, according to the conditions of his recognizance."

At the March term, 1868, of the court on the twenty-sixth day of the month, a new bill was found against Mr. Davis as follows:

"Circuit Court of the United States of America, and the District of Virginia. At a stated term of the circuit court, of the United States of America, for the district of Virginia, in the fourth circuit, begun and holden at the city of Richmond, within and for the district and circuit aforesaid, on the fourth Monday of November, and on the twenty-fifth day of the said month, in the year of our Lord one thousand eight hundred and sixty-seven, and continued by adjournment to the twenty-sixth day of March, one thousand eight hundred and sixty-eight.

"The grand jurors of the United States of America, in and for the district of Virginia, upon their oaths and affirmations respectively do find and present, that Jefferson Davis, late of the city of Richmond in the county of Henrico, and district of Virginia, gentleman, being a citizen and inhabitant of and residing within the said United States, under the protection of the laws of the said United States, and owing allegiance and fidelity to the said United States, not being mindful of his said duty of allegiance, and wickedly devising and intending the peace of the United States to disturb, and to excite and levy war against the said United States, on the first day of June, in the year one thousand eight hundred and sixty-one, at Richmond aforesaid, did unlawfully and traitorously collect and assist in collecting, great numbers of persons armed, equipped, and organized as military forces, for the purpose of levying war against the said United States, and did assume the command-in-chief of said forces, and with the said forces did unlawfully and traitorously take forcible possession of said city of Richmond, and said county of Henrico, and did by force of arms exclude therefrom all authority of said United States, and all persons acting under the same, and did, with said forces, occupy the said city and county and exclude therefrom the armed forces of the United States, sent by the government of the said United States to maintain the authority of the same in said city and county. And the grand jurors aforesaid, on their oaths and affirmations aforesaid, do say, that the said Jefferson Davis, on the said first day of June, in the year of our Lord one thousand eight hundred and sixty-one, at said Richmond, being a person owing allegiance to the

said United States, did maliciously and traitorously levy war against the said United States, and did commit this crime of treason against the said United States, against the peace and dignity of the United States of America, contrary to the form of the statute respecting the crime of treason, approved on the thirteenth day of April, in the year one thousand seven hundred and ninety.

"And the grand jurors aforesaid do further find and present, that Jefferson Davis, late of Richmond aforesaid, gentleman, an inhabitant of, and residing within the United States of America, and owing allegiance and fidelity to said United States, did, on the first day of June, in the year one thousand eight hundred and sixty-one, maliciously and traitorously collect, and assist in collecting great numbers of persons armed and equipped, and organized as military forces, for the purpose of levying war against the said United States, and did assume the command-in-chief of said forces, and with the said forces did unlawfully and traitorously take forcible possession of said Richmond, and said county of Henrico, and did by force of arms exclude therefrom all authority of said United States, and all persons acting under the same, and with said forces occupy the said city and county and exclude therefrom the armèd forces of the United States, sent by the government of the United States to maintain the authority of the same in said city and county. And so the grand jurors aforesaid, on their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said first day of June, in the year one thousand eight hundred and sixty-one, at said Richmond, being a person owing allegiance to the said United States, did maliciously and traitorously levy war against the said United States, and did commit the crime of treason against the peace and dignity of the United States of America, and contrary to the form of the statute respecting the crime of treason, approved on the seventh day of June, in the year one thousand eight hundred and sixty-two.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further present, that on the first day of August, in the year of our Lord one thousand eight hundred and sixty-two, a great many persons whose names are to the grand jurors unknown, to the number of one hundred thousand and more, were assembled, armed and equipped, and organized as military forces, with the usual weapons of war, and were maliciously and traitorously engaged in levying war against the said United States, in said Richmond, in said county of Henrico, and in the district of Virginia aforesaid, and in several states, to wit, the states of North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Texas, Arkansas, Tennessee, and Missouri. And that the said Jefferson Davis, at Richmond aforesaid, on the said first day of August, being an inhabitant of, and residing within, and

owing allegiance to the said United States, well knowing that the said military forces, organized as aforesaid, were engaged maliciously and traitorously in levying war against the said United States, did send to and procure for the said forces, munitions of war, provisions, and clothing, and did give to said forces information, counsel, and advice, maliciously and traitorously to assist them in levying war as aforesaid. And so the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said first day of August, at Richmond aforesaid, did maliciously and traitorously levy war against the United States, and did commit the crime of treason against the said United States, against the peace and dignity of the United States of America, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further present that at a place called Manassas, in the said district of Virginia, on the twenty-first day of July, in the year one thousand eight hundred and sixty-one, a great number of persons, whose names to the grand jurors are unknown, to the number of fifty thousand, and more, were assembled, armed, and equipped, and organized as military forces, with the usual weapons of war, and were maliciously and traitorously fighting against, killing, wounding and capturing officers and soldiers of the army of the United States, and destroying and capturing munitions and materials of war, being the property of the United States, and were then and there maliciously and traitorously levying war against the said United States, and that the said Jefferson Davis, at said Manassas, on the said twenty-first day of July, maliciously and traitorously did join himself to, and take part and assist by direction, advice and encouragement, the said military forces, then and there levying war against the said United States, as aforesaid, and so the grand jurors aforesaid, on their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said twenty-first day of July, at Manassas aforesaid, did maliciously and traitorously levy war against the United States, and did commit the crime of treason against the said United States, against the peace and dignity of the United States of America, and contrary to the form of the statute respecting the crime of treason approved on the thirtieth day of April, in the year one thousand seven hundred and ninety.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present, that the said Jefferson Davis, late of the city of Richmond aforesaid, gentleman, being an inhabitant of, and residing within the said United States of America, and owing allegiance and fidelity to the said United States, did at Richmond aforesaid, on the twenty-fifth day of May, in the year one thousand eight hundred and sixty-one, conspire and unite with Robert E. Lee, Judah P. Benjamin, John C. Breckinridge, William Mahone, Henry A. Wise, John Letcher, William Smith, Jubal A. Early, James Longstreet, Daniel H. Hill, Ambrose P. Hill, Gustave T. Beauregard, William H. C. Whiting, Edward Sparrow, Samuel Cooper, Joseph E. Johnston, John B. Gordon, Claiborne F. Jackson, and F. O. Moore, and with other persons whose names are to the grand jurors unknown, to the number of one hundred thousand, to levy war against the said United States, and that then and thereafter, in pursuance thereof, there were assembled and collected together a great number of persons including the said Jefferson Davis, and the said Robert E. Lee, Judah P. Benjamin, John C. Breckinridge, William Mahone, Henry A. Wise, John Letcher, William Smith, Jubal A. Early, James Longstreet, Daniel H. Hill, Ambrose P. Hill, Gustave T. Beauregard, William H. C. Whiting, Edward Sparrow, Joseph E. Johnston, John B. Gordon, Claiborne F. Jackson, and F. O. Moore, and the other persons whose names are to the grand jurors aforesaid unknown, armed, equipped, and organized as military forces with the usual weapons of war, maliciously and traitorously levying war in the said district of Virginia, and in the state of North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, Texas, Arkansas, Tennessee and Missouri, and that the said Jefferson Davis was selected and appointed by the persons aforesaid as commander-in-chief of the forces aforesaid, and was by the said forces recognized and obeyed as commander-in-chief as aforesaid, and that the said Jefferson Davis, of the city of Richmond aforesaid, on the said twenty-fifth day of May, well knowing that the said military forces were so levying war against the United States, did accept the office of commander-in-chief of the said forces engaged in levying war as aforesaid, and did then and there direct, counsel, assist, and encourage the said forces, and did maliciously and traitorously act as such commander-in-chief of said military forces in the levying of war against the said United States, as aforesaid, and so the grand jurors aforesaid, on their oaths and affirmations as aforesaid, do say that the said Jefferson Davis, on the said twenty-fifth day of May, at said city of Richmond, being a person owing allegiance to the said United States, did maliciously and traitorously levy war against the said United States, against the peace and dignity of said United States of America, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present, that on the second day of August, in the year one thousand eight hun-

dred and sixty-four, there were collected and gathered together a great many persons whose names are to the grand jurors unknown, of the number of one hundred thousand, armed, equipped, and organized as military forces, and as such engaged maliciously and traitorously in levying war against the said United States, and that Jefferson Davis, at Richmond aforesaid, on the said second day of August, being an inhabitant of, and residing within the United States of America, and owing allegiance to the said United States, and well knowing that the said military forces were engaged in levying war against the said United States, as aforesaid, did act as commander of said forces in their levying of war, and did, then and there, appoint one Girardi then acting as captain in said forces, to act as commander of a brigade of said forces so levying war as aforesaid, and did maliciously and traitorously appoint one Mahoney to be major-general of said forces, so levying war as aforesaid, and did direct one James A. Seddon to examine into the position of certain of said forces, to wit, a regiment of infantry commanded by one William Butler, and to ascertain whether the said Butler could be spared from his said regiment without injury to the service of levying war against the said United States, and so the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said second day of August, at said Richmond, being a person owing allegiance to said United States, did maliciously and traitorously levy war against the said United States, and did commit the crime of treason against the said United States, against the peace and dignity of the said United States of America, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present that, on the ninth day of February, in the year one thousand eight hundred and sixty-four, at Richmond aforesaid, there were collected and gathered together a great many persons whose names are to the grand jury unknown, armed, equipped, and organized as military forces, of the number of one hundred thousand, and as such forces engaged maliciously and traitorously in levying war against the said United States, and that the said forces were then generally known by the name of the armies of the Confederate States, and that the said Jefferson Davis, on the said ninth day of February, being an inhabitant of, and residing within the United States of America, and owing allegiance to said United States, and well knowing that the said forces were levying war against said United States, was acting as commander-in-chief of said forces, and did then and there maliciously and traitorously, as such commander-in-chief, issue an address to the said forces, in the words and figures following, to wit: 'Adjutant and Inspector-General's Office, Richmond, February 10, 1864. General Orders, No. 19. The following address of the president is published for the information of the army: Soldiers of the armies of the Confederate States, in the long and bloody war in which your country is engaged, you have achieved many noble triumphs, you have won glorious victories over vastly more numerous hosts, you have cheerfully borne privations and toils to which you were unused, you have readily submitted to restraints upon your individual will, that the citizen might better perform the duty of the state as a soldier. To all these you have lately added another triumph, the noblest of human conquests—a victory over yourselves. As the time drew near when you who first entered the service might well have claimed relief from your arduous labors and restoration to the endearments of home, you have heeded only the call of your suffering country. Again you come to tender your service for the public defense—a free offering which only such patriotism as yours could make—a triumph worthy of you, and of the cause to which you are devoted. I would in vain attempt adequately to express the emotion with which I received the testimonials of confidence and regard which you have recently addressed to me. To some of these separate acknowledgments were returned. But it is now apparent that a like generous enthusiasm pervades the whole army, and that the only exception to such magnanimous tender will be of those who, having originally entered for the war, can not display anew their zeal for the public service. It is, therefore, deemed appropriate, and it is hoped will be generally accepted, to make a general acknowledgment, instead of successive special responses. Would that it were possible to render my thanks to you in person, and in the name of our common country, as well as in my own, while pressing the hand of each war-worn veteran. I recognize his title to our love, gratitude, and admiration. Soldiers! by your will (for you and the people are but one) I have been placed in a position which debars me from sharing your danger, your suffering, and your privations in the field. With pride and affection my heart has accompanied you in every march; with solicitude it has sought to minister to your every want; with exultation it has marked your every heroic achievement; yet, never in the toilsome march, nor in the weary watching, nor in the desperate assault, have you rendered a service so decisive in results as in this last display of the highest qualities of devotion and self-sacrifice which can adorn the character of the war patriot. Already the pulse of the whole people beats in union with yours. Already they compare your spontaneous and unanimous offer of your lives for the defense of your country, with the halting and reluctant service of the mercenaries

who are purchased by the enemy at the price of higher bounties than have hitherto been known in war. Animated by the contrast, they exhibit cheerful confidence and more resolute bearing. Even the murmurs of the weak and timid, who shrink from the trials which make stronger and firmer your noble natures, are shamed into silence by the spectacle which you present. Your brave battle-cry will ring loud and clear through the land of the enemy, as well as our own; will silence the vain-glorious boasting of the corrupt partisans and their pensioned press; and will do justice to the calumny by which they seek to persuade a deluded people that you are ready to purchase dishonorable safety by degrading submission. Soldiers! the coming spring campaign will open under auspices well calculated to sustain your hopes. Your resolution needed nothing to fortify it. With ranks replenished under the influence of your example, and by the aid of your representatives, who give earnest of their purpose to add by legislation largely to your strength, you may welcome the invader with a confidence justified by the memory of past victories. On the other hand, debt, taxation, repetition of heavy drafts, dissensions occasioned by the strife for power, by the pursuit of the spoils of office, by the thirst for plunder of the public treasury, and, above all, the consciousness of a bad cause, must fall with fearful force upon the over-strained energies of the enemy. His campaign in 1864 must, from the exhaustion of his resources, both in men and in money, be far less formidable than those of the last two years, when unimpaired means were used with boundless prodigality, and with results which are suggested by the mention of the glorious names of Shiloh, and Perryville, and Murfreesboro, and Chickamauga, and the Chickahominy, and Manassas, and Fredericksburg, and Chancellorsville. Soldiers! assured success awaits us in our holy struggle for liberty and independence, and for the preservation of all that renders life desirable to honorable men. When that success shall be reached, to you,— your country's hope and pride,—under divine Providence, will it be due. The fruits of that success will not be reaped by you alone, but by your children, and your children's children, in long generations to come, will enjoy blessings derived from you that will preserve your memory ever-living in their hearts. Citizens—defenders of the homes, the liberties, and the altars of the Confederacy!—that the God whom we all humbly worship may shield you with His fatherly care, and preserve you for a safe return to the peaceful enjoyment of your friends and the association of those you most love, is the earnest prayer of your commander-in-chief. Jefferson Davis. Richmond, 9th February, 1864. By order: S. Cooper, Adjutant and Inspector-General,'—encouraging, conniving and advising the said forces to continue levying war against the said United States.

"And so the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said ninth day of February, at said Richmond, being a person owing allegiance to said United States, did maliciously and traitorously levy war against the said United States, and did commit the crime of treason against the said United States, against the peace and dignity of said United States of America, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations, do further find and present that, on the fifth day of January, in the year eighteen hundred and sixty-four, there were collected and gathered together a great many persons whose names are to the grand jurors unknown, of the number of one hundred thousand, armed, equipped, and organized as military forces, with the usual weapons of war, and as such forces engaged maliciously and traitorously in levying war against the United States in the district of Virginia, and in the states of Georgia and South Carolina, and that the said Jefferson Davis, at Richmond, in the district of Virginia, on the said fifth day of January, being an inhabitant of, and residing within the United States of America, and owing allegiance to said United States, and well knowing that the said forces were levying war as aforesaid, did maliciously and traitorously direct that a large number of said forces, to wit, fifteen thousand men, known as the 'Local Defense Men,' should be sent to defend the country and railroads between Charleston, in said South Carolina, and Savannah, in said Georgia, against the authorities and armies of said United States, and did maliciously and traitorously direct that certain other of said forces, so levying war. as aforesaid, should continue to defend said Charleston against said authorities and armies of said United States, he, the said Davis, at that time acting as commander-in-chief of said forces.

"And so the said grand jurors, upon their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said fifth day of January, at said Richmond, being a person owing allegiance to the said United States, did maliciously and traitorously levy war against the said United States, and did commit the crime of treason against the said United States, against the peace and dignity of the said United States of America, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present that, on the fourth day of January, in the year eighteen hundred and sixty-four, there were collected and assembled a great many persons whose names are to the grand jurors unknown, and of the number of one hundred thousand, armed, equipped, and organized as military

forces, and as such engaged maliciously and traitorously in levying war against the said United States, in the said district of Virginia, and in the state of North Carolina, and within other places within the United States, and that the said Jefferson Davis, at Richmond aforesaid, on the said fourth day of January, being an inhabitant of, and residing within the said United States, and well knowing that the said military forces were engaged in levying war against said United States, as aforesaid, did act as commander-in-chief of said forces in their said levying of war, and did then and there direct that a brigade of said forces should be sent to a place called Goldsboro, in the said state of North Carolina, maliciously and traitorously the said brigade then and there to fight against, kill, wound, and capture the officers and soldiers of the armies of the United States, there employed by the government of the said United States in upholding its authority.

"And as the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said fourth day of January, at Richmond aforesaid, being a person owing allegiance to the said United States, did maliciously and traitorously levy war against the said United States, and did commit the crime of treason against the said United States; against the peace and dignity of the said United States of America, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present, that Jefferson Davis, late of the city of Richmond aforesaid, gentleman, being an inhabitant of and residing within the United States of America, and owing allegiance and fidelity to the said United States, did on the twenty-fifth day of March, in the year of our Lord one thousand eight hundred and sixty-five, at Richmond aforesaid, unlawfully, falsely, wickedly, maliciously, and traitorously counsel and abet Robert E. Lee, Judah P. Benjamin, John C. Breckinridge, William Mahone, Henry A. Wise, John Letcher, William Smith, Jubal A. Early, James Longstreet, Daniel H. Hill, Ambrose P. Hill, Gustave T. Beauregard, William H. C. Whiting, Edward Sparrow, Samuel Cooper, Joseph E. Johnston, John B. Gordon, Claiborne F. Jackson and F. O. Moore, being persons owing allegiance to the said United States, and divers other persons, to the number of one thousand, whose names to the grand jurors aforesaid are unknown, also owing allegiance to the said United States, in and to, then and there, unlawfully, falsely, wickedly, maliciously, and traitorously combining and confederating together to levy war against the said United States, with the intent then and there to subvert the power thereof, and the said Robert E. Lee, together with the said other persons unknown to the grand jurors aforesaid, and the said Jefferson Davis, did then and there so unlawfully, falsely, wickedly, maliciously, and traitorously combine and confederate together for the purpose aforesaid, and did then and there levy war against the said United States of America, and the said Jefferson Davis, and the said Robert E. Lee, and the said other persons known as well as the said other persons unknown to the grand jurors aforesaid, confederates in pursuance of said unlawful, false, wicked, malicious, and traitorous combination and confederation, then and there collected large armies, constituting together one hundred thousand men and more, to levy and carry on war against the said United States. And the said Jefferson Davis, then and there falsely, wickedly, maliciously, and traitorously, and unlawfully commanded to make and carry on war upon and against the said United States, and the said armies did then and there, in obedience to the said command of the said Jefferson Davis, levy and carry on war upon and against the said United States, and the said Jefferson Davis then and there, to wit, on the said twenty-fifth day of March, did order, direct, and command the said Robert E. Lee, and the said other persons known as well as the said other persons unknown to the grand jurors aforesaid, to assault, fight, wound and capture, and kill the said officers and soldiers in the military service of the said United States, the said officers and soldiers being then in a fortification and fort known as and called Fort Steadman, which said fortification and fort was at and near the city of Petersburg, in the district of Virginia, within the jurisdiction of the court, and then was in the possession and occupancy of the said United States; and the said Robert E. Lee, and the said other persons known as well as said persons unknown to the grand jurors aforesaid, in obedience to the command of said Jefferson Davis, did then and there assault, fight, wound, and capture, and kill the said officers and soldiers in the military service of the said United States, in the said fortification and fort.

"And so the grand jurors aforesaid, upon their oaths and affirmations, do say that the said Jefferson Davis, on the said twenty-fifth day of March, in the year of our Lord one thousand eight hundred and sixty-five, at the said city of Richmond, being a person owing allegiance to the said United States, did, contrary to the duty of said allegiance, unlawfully, wickedly, falsely, maliciously, and traitorously levy war against the said United States, as aforesaid, and did then and there so commit one and more overt acts of treason against the said United States, as aforesaid, against the peace and dignity of said United States, in contempt of the laws, in violation of his duty of allegiance, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present, that Jefferson Davis, late of the city of Richmond aforesaid, gentleman, being an inhabitant of and residing within the said United States, and owing allegiance and fidelity to the said United States, did, at the city of Richmond aforesaid, on the thirty-first day of March, one thousand eight hundred and sixty-five, unlawfully, falsely, wickedly, and maliciously and traitorously counsel and abet Robert E. Lee, Judah P. Benjamin, John C. Breckinridge, William Mahone, Henry A. Wise, John Letcher, William Smith, Jubal A. Early, James Longstreet, Daniel H. Hill, Ambrose P. Hill, Gustave T. Beauregard, William H. C. Whiting, Edward Sparrow, Samuel Cooper, Joseph E. Johnston, John B. Gordon, Claiborne F. Jackson, and F. O. Moore, being persons owing allegiance to the said United States, and divers other persons to the number of one thousand, whose names are to the grand jurors aforesaid unknown, also owing allegiance to said United States, in and there and then falsely, wickedly, maliciously, and traitorously combining and confederating together to levy war against said United States, with the intent then and there to subvert the power thereof; and the said Robert E. Lee, together with the said other persons known as well as the said other persons unknown to said grand jurors, and the said Jefferson Davis, did then and there so unlawfully, falsely, and traitorously combine and confederate together for the purpose aforesaid, and did then and there levy war against said United States, and the said Jefferson Davis, and the said Robert E. Lee, and the said persons known as well as said persons unknown to the grand jurors aforesaid, confederates, in pursuance of the said unlawful, false, wicked, malicious, and traitorous combination and confederation, then and there called large armies constituting together one hundred thousand men and more, to levy and carry on war against said United States. And the said Jefferson Davis, then and there falsely, wickedly, and maliciously and traitorously commanded armies to levy, make, and carry on war against said United States, and the said armies did then and there, in obedience to said command of said Jefferson Davis, levy and carry on war against said United States, and the said Jefferson Davis, then and there, to wit, on the said thirty-first day of March, did order, direct, and command said Robert E. Lee, and the said other persons known as well as said persons unknown to the said grand jurors aforesaid, to assault, wound, capture, and kill the officers and soldiers of said United States, then being in martial array at and near Dinwiddie Court-House, in the county of Dinwiddie, and district of Virginia aforesaid, and within the jurisdiction of the court; and the said armies so

collected by the said Jefferson Davis as aforesaid, and the said Robert E. Lee, and the said other persons known as well as said other persons unknown to the grand jurors aforesaid, in obedience to the command of said Jefferson Davis, did then and there assault, fight, wound, and capture, and kill the said officers and soldiers in the said military service of the said United States, and so the grand jurors aforesaid, upon their respective oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said thirty-first day of March, one thousand eight hundred and sixty-five, at the said city of Richmond, being a person owing allegiance to said United States, did, contrary to his duty of his said allegiance, unlawfully, falsely, wickedly, maliciously, and traitorously levy and carry on war against said United States as aforesaid, and aid them, and did then and there, so become, and was guilty of treason against the United States aforesaid, against the peace of the said United States, in contempt of the laws, in violation of his duty of allegiance, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present, that Jefferson Davis, late of the city of Richmond aforesaid, gentleman, being an inhabitant of and residing within the United States of America, and owing allegiance and fidelity to said United States, did, at the city of Richmond aforesaid, on the first day of April, in the year of our Lord one thousand eight hundred and sixty-five, unlawfully, falsely, wickedly, maliciously, and traitorously counsel and abet Robert E. Lee, Judah P. Benjamin, John C. Breckinridge, William Mahone, Henry A. Wise, John Letcher, William Smith, Jubal A. Early, James Longstreet, Daniel H. Hill, Ambrose P. Hill, Gustave T. Beauregard, William H. C. Whiting, Edward Sparrow, Samuel Cooper, Joseph E. Johnston, John B. Gordon, Claiborne F. Jackson, and F. O. Moore, being persons owing allegiance to said United States, and divers other persons to the number of one thousand, whose names to the grand jurors aforesaid are unknown, also owing allegiance to the said United States, in and to, then and there, unlawfully, falsely, wickedly, maliciously, and traitorously combining and confederating together to levy war against said United States, with the intent then and there to subvert the power thereof, and the said Robert E. Lee, together with said other persons known as well as those unknown to the grand jurors aforesaid, and the said Jefferson Davis, did then and there, so unlawfully, falsely, traitorously, maliciously, combine and confederate together for the purpose of making war against said United States, and did then and there levy war against the United States as aforesaid. And the said Jefferson Davis, and the said

Robert E. Lee, and the said other persons known as well as said other persons unknown to the grand jurors, confederates, in pursuance of the said unlawful, false, wicked, malicious, and traitorous combination and confederation, then and there collected large armies, constituting one hundred thousand men and more, to levy and carry on war against said United States. And the said Jefferson Davis, then and there, to wit, on the said first day of April, did order, direct, and command said Robert E. Lee, and the said persons known as well as said persons unknown to the grand jurors aforesaid, to assault, wound, fight, capture, and kill the officers and soldiers in the military service of said United States, then being in martial array for the defense of the authority of said United States, at and near a place known and called the Five Forks, in the district of Virginia aforesaid, and within the jurisdiction of this court, and the said armies so collected by the said Robert E. Lee, and said other persons known as well as said other persons unknown to the grand jurors aforesaid, in obedience to the command of the said Jefferson Davis, did then and there assault, fight, capture, and kill the said officers and soldiers in the said military service of said United States.

"And so the grand jurors aforesaid, on their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said first day of April, one thousand eight hundred and sixty-five, at the said city of Richmond, within the jurisdiction of this court, being a person owing allegiance to the said United States, did, contrary to his duty of said allegiance, unlawfully, maliciously, and traitorously levy and carry on war against said United States as aforesaid, and did then and there so become, and was guilty of treason against said United States, as aforesaid, against the peace of said United States, in contempt of the laws and in violation of his duty of allegiance, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present, that Jefferson Davis, late of the city of Richmond aforesaid, gentleman, being an inhabitant of, and residing within the United States of America, and owing allegiance and fidelity to said United States, and at the city of Richmond aforesaid, on the second day of April, in the year of our Lord one thousand eight hundred and sixty-five, did unlawfully, maliciously, and traitorously counsel and abet Robert E. Lee, Judah P. Benjamin, John C. Breckinridge, William Mahone, Henry A. Wise, John Letcher, William Smith, Jubal A. Early, James Longstreet, Daniel H. Hill, Ambrose P. Hill, Gustave T. Beauregard, William H. C. Whiting, Edward Sparrow, Samuel Cooper, Joseph E. Johnston, John B. Gordon, Claiborne F. Jackson, and F. O. Moore, being persons owing allegiance to said United States, and divers other persons owing allegiance to said United States, to the number of one hundred thousand, whose names are to the grand jurors unknown as aforesaid, in and to, then and there unlawfully, falsely, maliciously, and traitorously combining, confederating together to levy war against said United States, with intent then and there to subvert the power thereof, and the said Robert E. Lee, together with said other persons known as well as the said other persons unknown to said grand jurors, and the said Jefferson Davis, did, then and there, so unlawfully, falsely, maliciously, and traitorously combine and confederate together for the purpose aforesaid, and did then and there levy war against said United States. And the said Jefferson Davis, and the said Robert E. Lee, and the said other persons known as well as said other persons unknown to the grand jurors aforesaid, confederates, in pursuance of the said unlawful, false, and malicious and traitorous combination and confederation, then and there collected large armies, constituting one hundred thousand men and more, to levy and carry on war against said United States, and the said armies did then and there, in obedience to the said command of said Jefferson Davis, levy and carry on war upon and against said United States, and that the said Jefferson Davis, then and there, to wit, on the said second day of April, did order, direct, and command said Robert E. Lee, and said other persons known as well as said other persons unknown to the grand jurors aforesaid, to assault, capture, and kill the said officers and soldiers of said military service of said United States, then being in martial array for the defense and authority of said United States, at and near the city of Petersburg, in the said district of Virginia, and within the jurisdiction of this court. And the said armies so collected by the said Jefferson Davis, and by the said Robert E. Lee, and by the said other persons known as well as the said other persons unknown to the grand jurors aforesaid, in obedience to the command of said Jefferson Davis, did then and there assault, fight, wound, capture, and kill the said officers and soldiers in said military service of said United States.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do say that the said Jefferson Davis, on the said second day of April, one thousand eight hundred and sixty-five, did, at the said city of Richmond, and within the jurisdiction of this court, being a person owing allegiance to said United States, contrary to his duty of allegiance, unlawfully, falsely, and maliciously and traitorously levy and carry on war against said United States as aforesaid, and did, then and there become guilty of the crime of treason against said United States, in contempt of the laws, and in violation of his duty of allegiance, and contrary to the form of the statute in such case made and provided.

"And the grand jurors aforesaid, upon their oaths and affirmations aforesaid, do further find and present that the said Jefferson Davis, on the twenty-fifth day of May, in the year eighteen hundred and sixty-one, and continuous thereafter until the tenth day of May, in the year eighteen hundred and sixty-five, was a person fleeing from justice within the intent and meaning of the statute of the United States of America in such case made and provided; and that on the twenty-fifth day of May, eighteen hundred and sixty-one, there was a rebellion against the said United States, which continued for several years, to wit, until the tenth day of May, eighteen hundred and sixty-five, and that during the whole period of said rebellion by reason of the resistance to the execution of the laws of the United States, and the interruption of the ordinary course of judicial proceedings, process for the commencement of any action, civil or criminal, against the said Jefferson Davis, or for his arrest, could not be served, and the said Jefferson Davis could not, by reason of such resistance of the laws, and such interruption of such judicial proceedings be arrested, or served with process for the commencement of any action, civil or criminal, within the intent and meaning of the statute of the United States in such case made and provided.

"March 26th, 1868.

                    "L. H. Chandler,
"United States District Attorney for Virginia.

"This indictment found on testimony of: Robert E. Lee, Lexington, Rockbridge county, Va. James A. Seddon, Dover Neighborhood, Goochland county, Va. Charles B. Duffield, Duke street, city of Norfolk. John Letcher, Lexington, Rockland county, Va. George Wythe, Munford, near Gloucester Court House, Gloucester County, Va. John B. Baldwin, city of Stanton, Va. Charles E. Wortham, 110 Fifth street, Richmond, Va. Thomas S. Hayward, Cary street, between First and Second, Richmond, Va."

At the same term an order was entered continuing his recognizance until Saturday, the second day of May next, and on that day a new one was entered into by the same parties, in the same amount, for his appearance on the first Monday in May, the day after but one, it having been set by agreement to be tried at a special session of that term, to be held in June. On the twenty-eighth of May this agreement was filed in the cause:

"Circuit Court of the United States for the District of Virginia. The United States against Jefferson Davis. This case will not be called for trial on the third day of June next, but counsel will then appear on behalf of the United States, and also on behalf of the defendant, and an order will then be entered by consent in the form heretofore used in this case, giving the defendant time to appear until such day in the month of October next as may be agreeable to the court. New York, May 28, 1868. Wm. M. Evarts, of Counsel for the United States. Ch. O'Conor, of Counsel for Defendant."

Accordingly, on the twenty-third day of June, an order of continuance was entered, and a new recognizance in the same amount, by the same parties, was given conditioned for the appearance of Mr. Davis on the fourth Monday of next November, at the term of the court then to be held.

While these various proceedings were being had, the congress of the United States had amended the constitution of the United States by forcing the late Confederate States to accept certain amendments proposed by it, refusing to allow them any rights under the laws until they had so agreed to the propositions submitted to them. In this way congress secured the vote of states sufficient to accept constitutional amendments, and thus actually changed the organic law for states which had always adhered to the Union, and which protested against the change, by the votes of states held under martial law, and which were made at the point of the bayonet to repeat the words required of them. Thus the lately loyal states made the constitution for the states always loyal. Among these amendments was the one imposing perpetual disfranchisement for aiding in rebellion, after having held certain offices. As soon as this amendment was declared adopted in the ambiguous language of the proclamation announcing the fact, or the hypothetical fact (it declared that if the votes of the late Confederate States were to be considered binding, and if the other states had no right to retract their ratification of the amendment, then it was ratified and adopted—otherwise not) the counsel for Mr. Davis prepared to attack the prosecution pending against him on the grounds disclosed in the following proceedings, which the reporter understands were inspired and suggested from the highest official source—not the president of the United States. It was arranged that the chief justice should attend the court at the November term, 1868, and hear the argument on the motion to quash or dismiss the prosecution. On the thirtieth day of that month, Robert Ould, Esq., one of Mr. Davis' counsel, filed the following affidavit: "On this thirtieth day of November, 1868, Robert Ould personally appeared in open court, and, being sworn, made oath that defendant, Jefferson Davis, was in the year 1845, previous to the alleged commission of the offenses set forth and charged in said indictment, a member of the congress of the United States, to wit, a member of the house of representatives of the United States from the state of Mississippi in said congress, and as such the said Jefferson Davis did, on the eighth day of December, 1845, take an oath to support the constitution of the United States."

On filing the above affidavit, the counsel of Mr. Davis obtained a rule on the attorney

for the United States, to show cause why the indictment should not be quashed. On Thursday, December 3d, a hearing was had on this rule. Robert Ould, Esq., of Richmond, Charles O'Conor, Esq., of New York, Hon. William B. Reed, of Philadelphia, and James Lyons, Esq., of Richmond, appeared for the defendant. District-Attorney S. Ferguson Beach, Richard H. Dana, Jr., Esq., of Boston, and General H. H. Wells, represented the government of the United States. The court-room was filled with auditors, among whom were General Stoneman, other federal officials, and many ladies.

When the case was called, Mr. Beach stated to the court that a pressure of official duties rendered it impossible for the attorney-general to be present. He asked that a written statement be filed specifying the grounds upon which the motion to quash was based. His own connection with the case was slight and recent, and the special counsel for the government having had short notice, had given it little attention. It was probable that after the defense had opened the argument, it might be necessary for himself and learned associates to ask time to prepare their reply.

Mr. O'Conor assumed that there was no necessity of making any formal reply. The counsel for the government had been fully informed by his associate, Judge Ould, of the grounds relied upon.

THE CHIEF JUSTICE said the suggestion of the district attorney was that no formal statement of the reasons for the motion had been filed with the clerk. The court had supposed that such a statement was filed; and certainly it should have been done.

Mr. O'Conor thought the affidavit on file contained all that was necessary to advise counsel of the grounds assumed by the defense. All the material facts were stated therein, to wit, that Jefferson Davis had been a member of the senate, had taken the prescribed official oath to support the constitution of the United States, and had afterwards engaged in the rebellion. They clearly indicated the grounds of the motion. The moment Mr. Davis' counsel determined to make the motion, the attorney-general was informed of the fact by a note addressed to him, the point to be made being concisely stated; and a due apology was also tendered for the shortness of the notice. That note was received on Friday last, and was duly acknowledged on behalf of the government by Mr. Evarts, the special counsel in the case. He then made no complaint of any insufficiency in the notice in any respect. A single point was presented, and that rested on facts admitting of no prolixity in statement. In fact the attorney-general had had notice which though informal was satisfactory to him, several days before the matter was first mentioned in court.

Mr. Dana did not understand for what purpose the learned counsel had just addressed the court, if he did not object to the suggestion made by the district attorney. On Monday last he had been first informed by telegram that his presence here was desired, to show cause why the indictment against Mr. Davis should not be quashed. When he reached Richmond he had inquired for the ground of the motion, and found only an affidavit setting forth that Jefferson Davis had been a member of the congress of the United States, in 1845; and in that capacity had taken an oath to support the constitution of the United States. He did not see that this had anything to do with the indictment, yet the motion to quash must be founded on the indictment. If the defense wished the benefit of the facts stated in the affidavit, they must be either proved or conceded, and then the defense must avail themselves of them by a plea in abatement. The government had no doubt of the facts alleged, and stood ready to admit them, but he insisted that there should be a written statement of the grounds upon which the motion was made, so that the case should be put upon a basis of which counsel should not be ashamed. If any new fact is imparted, we must agree to it, and then be informed what use the defense intend to make of it. In conclusion, Mr. Dana protested that he did not wish any unnecessary delay.

Mr. O'Conor said that the propriety of bringing this matter up by affidavit instead of by special pleading, was a question to come up hereafter on the merits. But the defense would not object to placing the grounds of their motion on record. Having every desire to accommodate, he would draw up the statement, whilst his learned associate (Judge Ould) opened the case.

The District Attorney (Mr. Beach) expressed a wish that this should be done before the argument commenced.

THE CHIEF JUSTICE said that the court would like to get through with the matter as soon as possible, inasmuch as the supreme court was to meet on Monday, and he (the chief justice) ought to be in Washington a day or two before that time. The demand, however, for a brief statement of the point made was not unreasonable, and the paper had better be prepared at once.

After a short recess, Mr. O'Conor presented the following statement, and motion:

"Circuit Court of the United States for the District of Virginia. The United States v. Jefferson Davis. The indictments in these cases were framed on the alleged fact that the defendant had engaged in the insurrection and rebellion against the United States, known to the court and to the several departments of the government as having existed at the several times mentioned in the said indictment in the state of Virginia and elsewhere, and thereby given aid and comfort to the enemies of the United States engaged in said insurrection and re-

bellion. And the defendant alleges that prior to such insurrection and rebellion, and in the year 1845 he, the said defendant, was a member of the congress of the United States, and as such member took, in said year, an oath to support the constitution of the United States in the usual manner, and as required by law in such case. And the defendant alleges in bar of any proceedings upon said indictments, or either of them, the penalties and disabilities denounced against and inflicted on him for his said alleged offense by the third section of the fourteenth article of the constitution of the United States, forming an amendment to such constitution. And he insists that any judicial proceeding to inflict any other or further pain, penalty, or punishment upon him for such alleged offense is not admissible by the constitution and the laws of the United States. Wherefore he, the said defendant, moves the court now here to quash and set aside the said indictments, or to dismiss the same and the prosecution thereon, or to render such other relief in that nature as the aforesaid facts and circumstances shall require, and as may seem proper. Charles O'Conor. William B. Reed. Robert Ould. James Lyons."

Thereupon Mr. Beach submitted the following reply on behalf of the government:

"United States v. Jefferson Davis. To enable the court at once to consider and pass upon the question of dismissing this case under the motion above made, with the benefit of facts necessary to such consideration, and which do not appear on the record, inasmuch as the counsel for the United States believe these facts to exist and to be provable, they waive the regular process of plea, and agree that the court may assume as facts, for the purpose of this motion, that Jefferson Davis, in the year 1845, and previous to the alleged commission of the offenses set forth in the indictment, did take an oath as a member of congress of the United States to support the constitution of the United States, and that this agreement shall also be of effect in case the above motion shall be considered by the supreme court of the United States. S. F. Beach, United States District Attorney. December 3, 1868."

THE CHIEF JUSTICE. Both the papers may be filed.

Judge Ould then commenced the argument for the defendant on the motion to quash. He said it was now a concession in the cause brought properly to the notice of the court that Jefferson Davis was in 1845 a member of the United States congress, and in that capacity took an oath to support the constitution of the United States. As had been supposed by the learned counsel on the other side, the affidavit filed by the defendant bears an intimate relation to the third section of the fourteenth constitutional amendment, which provides that every person who, having taken an oath to support the constitution of the United States, afterwards engaged in rebellion, shall be disqualified from holding certain state and federal offices. Whether this section be of the nature of a bill of pains and penalties, or in the form of a beneficent act of amnesty, it will be agreed that it executes itself, acting proprio vigore. It needs no legislation on the part of congress to give it effect. From the very date of its ratification by a sufficient number of states it begins to have all the effect that its tenor gives it. If its provisions inflict punishment, the punishment begins at once. If it pardons, the pardon dates from the day of its official promulgation. It does not say that congress shall, in its discretion, prescribe the punishment for persons who swore they would support the authority of the United States and then engaged in rebellion against that authority, but itself pronounces the penalty and inflicts the punishment. For this declaration there is the authority of the supreme court as laid down in Ex parte Garland [4 Wall. (71 U. S.) 333], and in Cummings v. State of Missouri, Id. 321. A majority of the court there held that deprivation from office, in one form or another, couched in civil law or criminal proceedings, is punishment for an offense. Id. The theory of political security rests upon the fact that mankind are endowed with certain inalienable rights,—life, liberty, and the pursuit of happiness,—and any deprivation or suspension of those rights is a punishment, and can be no otherwise defined. This same doctrine is laid down in Ex parte Garland, Id. 344, and in the argument of that case counsel referred to numerous authorities to prove the fact that disqualification from office-holding is punishment. Judge Goldthwaite—[Ex parte Dorsey] 7 Port. [Ala.] 298—held this ground, and questioned whether any ingenuity could devise a punishment more calculated to operate on the public mind. Spencer, C. J., had remarked that the disfranchisement of a citizen is no unusual punishment for treason. So the very law under which the indictment against Mr. Davis is framed, expressly excludes from federal offices those who engaged in the rebellion or insurrection. It might, then, be taken for granted that the third section of the fourteenth amendment does inflict punishment for certain offenses set forth on its face, to wit, having engaged in rebellion after taking an oath to support the constitution of the United States. The act of 1862 [12 Stat. 590] had prohibited those who had committed this offense from holding federal offices, and this constitutional amendment went still further. It prescribed disqualification from holding state offices; and there is no fact or count in that indictment that is not embraced in the terms of the third section of this constitutional amendment. The question then arises, is this punishment set forth in section three exclusive or cumulative? The defendant's counsel hold that it is exclusive, and affords the only rule of punishment in the

case of Mr. Davis, who is at this moment suffering under that penalty. The gentlemen on the other side will hardly deny that such a rule of construction must be adopted as will place the amendment in harmony with other parts of the constitution. Can the third section of this amendment be so construed, without straining it, as to take away from it the sting of being an ex post facto law? If there was one construction that would make it an ex post facto law, and another that would not, the court should undoubtedly embrace the latter: the construction which makes it beneficent, and makes it harmonize with other provisions of the constitution. If it be construed that this provision is cumulative, or prescribes penalties in addition to those laid down in the acts of 1790 and 1802 [1 Stat. 117; 12 Stat. 590], then by every rule of construction it is made an ex post facto law. This third section, unlike the others, refers only to past transactions; it has no force whatever upon the participators in any future rebellion. In [Cummings v. State of Missouri] 4 Wall. [71 U. S.] 328, an ex post facto law is defined to be one that prescribes additional punishment for crimes committed before its passage. The conclusion is irresistible that if the punishment prescribed is cumulative, this is an ex post facto law. But if the punishment is exclusive,—the last expression of the national will on the subject,—it gives the whole punishment, and nullifies all conflicting acts. Then the conclusion that it is ex post facto is escaped. For although punishment may be inflicted by a new law for offenses already committed, if the new law prescribes a lighter punishment it is not an ex post facto law. Otherwise, it is a bill of attainder, or at least a bill of pains and penalties, which is a legislative declaration by which a higher punishment is fixed for an offense already committed. Now, if this section is construed exclusively, the sting of a bill of attainder is taken away, and it is a matter of mercy instead of a matter of wrath. He asked the court to put the beneficent construction upon it. True, there is no distinct provision in the constitution that no man shall be punished twice for the same offense; but there is a principle in the Anglo-Saxon heart, and acknowledged everywhere, which forbids such a monstrous thing. It is not less than a constitutional provision. However slight the punishment may be, when a man receives that he goes free. Jefferson Davis has been punished, and is now undergoing punishment. The law under which he is punished is its own interpreter and executioner, and the district attorney has nothing to do with it. The punishment, he repeated, is now being inflicted by the voice of the American people, who have tried him and pronounced the sentence that he shall be disqualified from holding any office, state or federal. Further, this law is a special provision, and supersedes all

general provisions with reference to a general object. Before this combination all general statutes, whatever they are, must pass away and not be considered. It is also a constitutional provision. These other enactments are statutes at large made under the constitution; this is a specific provision of the constitution itself. If there is any discrepancy between this and the general act, or if both meet the case, but in a different manner, the statute goes down and the constitution prevails. It says that the punishment shall be deprivation from office; the statute says imprisonment. If you enforce the statute you go further than the constitution provides. But if he was wrong in all this, and if the constitutional amendment is to be degraded into a statute and stripped of its force, he would insist still, that being the last legislative expression of the will of the people, it should prevail. He quoted Rex v. Davis, 1 Leach, 271, to prove that where a statute makes an offense punishable as a felony, and another inflicts a milder punishment, the latter must prevail. Again, every statute repeals all statutes repugnant thereto without a repealing clause. Com. v. Kimball, 21 Pick. 373; Nichols v. Squire, 5 Pick. 168. Another position taken was, that it was the design of the law-makers to make disqualification from office the only punishment for engaging in the late Rebellion. Nobody even suggested the punishment of any but the leaders, and very few of them. In the language of Burke, "You cannot bring an indictment against a nation." If all who engaged in the rebellion were tried, where could a jury be found? How could a man be convicted without perjury? Everybody was on either one side or the other. How, then, could impartiality be secured? All this was seen, and the plan of selecting for punishment those who had enjoyed the confidence of the people, and led them into rebellion, was settled upon. In this view it was a beneficent enactment; otherwise it was monstrous.

When Judge Ould concluded, Mr. Dana inquired what course the court would take in reference to the session.

THE CHIEF JUSTICE said there would be no recess. The court would sit until half-past 3 o'clock, and then adjourn until to-morrow.

Mr. Dana said the counsel for the United States had had no opportunity to confer, and as the motion had been on a point unexpected to them, and probably to the court, they desired time to look over authorities. This was an entirely new proposition in law, for which there is no precedent. Such a case could not arise under any but a written constitution. It was natural, under these circumstances, that time should be desired for reflection.

THE CHIEF JUSTICE inquired about what agreement had been made in regard to the number of speeches on either side.

Mr. O'Conor said that Judge Ould and himself were the only speakers on the side of Mr. Davis.

Mr. Beach asked that he and Governor Wells might be heard for the government that afternoon, and Mr. Dana to-day. This proposition was acceded to, and the court took a recess for an hour.

Before the recess THE CHIEF JUSTICE thought proper to say that the court had not been surprised, as intimated by Mr. Dana, at the ground taken by the defendant. The course of the argument was anticipated, as it was expected that the point to be urged was the common principle of constructive repeal.

Mr. Beach opened the argument in opposition to the motion. Quoting the terms of the third section of the amendment, and adverting to the defendant as being among the persons designated in the section, he proceeded to combat the essential proposition on which the motion was founded. This proposition was, that the third section of the amendment had repealed the act under which the indictment was framed. If the act had been repealed, no prosecution, of course, could be maintained under it, but he denied that there had been any such repeal, either in terms, or by implication or upon any justifiable theory as to the purpose and object of the amendment. There was clearly no express repeal—and having stated the rules and cited the authorities by which the courts are governed on the question of an implied repeal, he maintained that under none of these rules, and on none of these authorities, could the act be regarded as repealed by implication. There was no conflict whatever between the act and the constitutional provision—no repugnancy, no inconsistency, much less that degree of either essential to an implied repeal. The amendment prescribed no new or different punishment for having engaged in insurrection or rebellion. To prescribe punishment for crime was not its purpose—was no part of its purpose. It was directed, in the section under consideration, to the end of securing the administration of the government, state and national, in the hands of those who had never been in insurrection against it, and although disabilities were thereby imposed upon the individuals described in the section, this was but the incidental consequence—not the substantive purpose of the amendment. Surely it was competent for the nation—without thereby declaring impunity for their offenses—to provide, by constitutional enactment, that men who had waged a great but unsuccessful war for its destruction, should not be afterwards admitted to its councils. Adverting to the history of the period, he argued to show that no such consequence as that assumed was in the mind either of the congress which proposed, or of the legislatures which ratified the amend-

ment. The number of persons falling within the category of the third section was a very small one, embracing, however, the originators and prominent actors in the great civil strife—among them, the accused, who was its head and front; was it to be supposed that this class had been singled out by the nation as objects of special and peculiar favor, and that the design was to exempt them wholly from criminal responsibility, while the great crowd of humbler offenders, who had but followed the lead of these, their chiefs, were to be left exposed to fines, forfeitures, and imprisonments? The ground of the present motion was, that just this discrimination was intended—a discrimination which proclaimed amnesty to the leaders, and denounced pains and punishments upon the rank and file of the Rebellion. Such a theory of the amendment was in direct reversal of the known national sentiment in this regard—was repugnant both to the instinctive and deliberate promptings of an enlightened people, and could have no adequate support, except in terms which should admit of no other. Brought to the test of any standard, whether to the narrower and more technical one to be found in the established rules for the construction of the written law, or to the broader one to be found in the recognized principles which guide and determine the conduct of civilized communities under circumstances like those which brought about the adoption of the constitutional amendment, the proposition on which the motion rested, and the motion itself, must fail.

General H. H. Wells, with the district attorney.

This motion to quash, separated from what is manifestly irrelevant, rests upon the assumption that the third section of the fourteenth amendment of the constitution repeals the former laws punishing treason and rebellion. The repeal is not, however, supposed to be contained in any expressly repealing clause or language, but it is claimed that the language of this third section repeals the old law by implication. How this repeal by implication arises does not appear very clear, even to the acute perception of the learned counsel who opened this discussion. We are justified in saying so, because he builds chiefly, not on the language employed, nor upon any manifest repugnancy between the old law and the new one, but finds it necessary, if we understood his argument, to establish these propositions, and in about this order: 1st. That the third section of the fourteenth amendment is, as to the accused, either a bill of penalties or a pardon. 2d. That whichever it be, it executes itself, it takes effect from its date, and needs no legislative action to give it effect or force. 3d. Whether it is the one or the other is simply a matter of legal construction. 4th. That the court should give

the language employed such a construction as will, if possible, harmonize the old and the new law, such construction should also be given as will render the last provision or enactment free from the objection of being ex post facto. 5th. The constitutional provision is inconsistent and incompatible with the old law, and therefore it, by implication, repeals the former enactment.

In discussing only the question of repeal as is my duty on this occasion, I am at the outset greatly inclined to doubt the correctness of the conclusion arrived at by the counsel, because the repeal he has undertaken to establish is not the clear, natural, or inevitable result and consequence that must follow, because the two enactments are so utterly incompatible that they can not stand together; but it is, on the other hand, the doubtful result of an involved, complicated argument, founded upon many premises, the failure of any one of which is absolutely fatal to all that follows. Clearly, the section of the constitution which is referred to, is a bill of penalties, and it is as certainly not a pardon. That it is not a pardon is manifest, because it declares or imposes a disability as the consequence, or as a punishment for doing the act mentioned, and it authorizes a remission of the penalty by congress—a method of restoration lacking all the distinctive features of a pardon. That it is not a pardon of the offense of which Mr. Davis stands indicted is evident, because the offense described in the third section is not the same as that for which he is indicted. The offense there named is "engaging in insurrection or rebellion against the United States, or giving aid or comfort to the enemies thereof." He is indicted for treason in levying war against the United States. The offenses are not only totally unlike, but the persons against whom the penalties are declared are not the same. Any citizen who levies and carries on actual war against the United States is guilty of treason, but the pains of the third section are directed only against those who, having previously taken an oath as a member of congress, an officer of the United States, a member of a state legislature, or as an executive or judicial officer of any state to support the constitution of the United States, afterwards engaged in insurrection or rebellion. How, then, can it, for the purposes of this discussion, be material whether or not this constitutional provision executes itself? How would an admission of the fact, either way, touch the question of repeal of the old law? It certainly can not be material either that the true intent and meaning of the statute is arrived at by construction, instead of standing out clearly upon the face of the law. Of this section it is enough to say, that to every man's comprehension it punishes a new offense, and a different class of persons. From the old law ordinarily the language used in the constitution is, "congress shall have power," for instance, to punish counterfeiting. Here the constitution declares the penalty, and authorizes congress to relieve from it, who? not those who have been tried and found guilty of treason, but those who, deeming themselves disabled from holding office, ask to have their disabilities removed. It is difficult to disbelieve that this third proposition is not stated mainly to afford an opportunity conveniently to enunciate the one which follows it. It is the scaffolding which was designed to support something else, that would not stand by itself. What need is there for raising either of them, for after all the whole substance of the matter is embraced in the fifth statement, to wit, that the third section of the fourteenth amendment is incompatible with the old law, and therefore the latter must yield to it. The only pertinent inquiry is, Are they incompatible? If there is no such incompatibility the discussion is at an end—both the law and the constitution stand.

The substantial questions of law presented here, are by no means novel or difficult, and would perhaps, be agreed to by us all—they may be conveniently stated thus: An indictment can not be sustained upon a statute which has already been repealed, unless the repealing act contains a saving clause. That the declaring of a less penalty for the same offense, operates as a repeal of the old penalty. To both of these propositions I certainly cordially assent—and they are in fact abundantly supported by the highest authority, and the soundest reason. It is, however, only necessary in their support to say that, in the very nature of things, no person can be punished for a statutory offense, unless, at the very moment when sentence is pronounced upon him, the statute itself exists in full force and vigor. On the other hand, it is also as evident that the statute under which the accused stands charged has not been repealed in terms, but if repealed at all it is by implication only. That the repeal of statutes by implication is not favored. There must be a positive repugnance between the provisions of the new law and the old to work a repeal by implication. [Wood v. U. S.] 16 Pet. [41 U. S.] 342; Wilson v. Rousseau [Case No. 17,832]; Foote v. Silsby [Id. 4,916]; Aspden's Estate [Id. 589]; Vandever v. Tilghman [Id. 16,846;] U. S. v. Twenty-five Cases of Cloths [Id. 16,563]; [Taylor v. U. S.] 3 How. [44 U. S.] 197; Morlot v. Lawrence [Case No. 9,815]; Sedg. St. & Const. Law, 123 et seq.; Norris v. Crocker, 13 How. [54 U. S.] 429. We maintain confidently that between the statutes under which this indictment was found, and the third section of the fourteenth amendment, there is no repugnance—nor could there be any, by any possible construction of the two, Because; 1st. The offenses are not the same. One is treason requiring an overt act of levying war to constitute it; the other is insurrection or rebellion, which may be committed by simply

giving counsel to enemies or others raising insurrection. 2nd. The third section of the amendment only deprives one class of persons—those who for a certain purpose, have taken a certain oath—of one privilege, that of office-holding.

It not unfrequently occurs that by the doing of one act two offenses are created; for instance, burglary and larceny—would it be maintained that a statute which repealed a former statute punishing such a burglary, as a burglary, would also by implication repeal the other statute that defined and punished the larceny as a larceny? The truth is, that the two offenses are perfectly distinct. A person might be guilty of one, and not guilty of the other—or the same acts may constitute both offenses, as where one who had, after taking an oath as a member of congress to support the constitution, afterwards engaged in insurrection and rebellion, and in doing so, had also levied war against the United States, and thus committed treason. He would thereby be guilty of two offenses, punishable one capitally, and the other by a political disability. In such a case—and it is this case—the two statutes stand well together, and there is neither inconsistency nor incompatibility. The constitutional provision does not repeal the old law.

Richard H. Dana, Jr., for the United States.

The defendant is indicted for treason by "levying war" against the United States. By the constitution (article 3, § 3), treason can be committed in but two ways—one, the actually levying war against the United States; and the other, the adhering to their enemies, "giving them aid and comfort." Since the case of U. S. v. Chenoweth [Case No. 14,792], it has been assumed that giving aid and comfort to rebels in arms against the government in a civil war, does not come within the second branch of treason, and the defendant is not indicted for anything less than the actual levying of war. Nothing, therefore, can be a defense to this indictment, unless it is a denial of the levying of war, or is a bar to proceedings against the defendant for that exact offense.

The pleadings and arguments before the court established the fact, for the purposes of the opinion of the court, that Jefferson Davis had taken the oath as a member of congress, and, while such member, "engaged in insurrection and rebellion," against the United States. It is contended that article 14, § 3, of the amendments of the constitution is a bar to any further proceedings against the defendant on this indictment for treason. The position taken by the defendant's counsel is that by the effect of this amendment, the defendant has already suffered punishment or a penalty for the act charged in the indictment. The part of the amendment relied upon is as follows: "No person shall be a senator or representative in congress, or elector of president and vice-president, or

hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath as a member of congress or as an officer of the United States, &c. * * * to support the constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. But congress may, by a vote of two-thirds of each house, remove such disability." The fifth section of the article of amendment is as follows: "The congress shall have power to enforce, by appropriate legislation, the provisions of this article." It is conceded by the counsel for the defendant, that congress has not provided any method of proceeding against a person under section three of this amendment, or of ascertaining or declaring any disability affecting any individual thereunder; and, of course, it is further conceded that there have been no proceedings against the defendant of any character whatsoever—judicial, legislative, or executive—under that section. On such a concession there is no position left to the defendant except to argue that the amendment of the constitution executes itself by the mere fact of its existence on every person who may come within its scope. But even this is not enough. It is further necessary for the defendant to contend, and his counsel does contend, that the adoption of that amendment by the people is a repeal of the statutes against treason in force when it was adopted, as to all persons who come within its terms.

Upon this statement it appears that there are two questions for the court:—First, does amendment 14 inflict a punishment or penalty, in the sense of the criminal law, so as to come within the category of criminal statutes? Second, if it does inflict a punishment in that sense, is it for the offense of treason by levying war, so as to repeal the penalties in the statute against treason?

First. The fourteenth amendment is not a mere provision of a criminal law to punish individuals for offenses. It is a permanent addition to our organic political system, for the purpose of securing fidelity in the administration of office. It is highly improbable that the people would put into the constitution mere punishments and penalties on individuals, to take effect by the force of the constitution itself, without judicial proceedings, for the purpose of ascertaining the guilt of the party. It is far more probable that the purpose of a constitutional provision would be a general permanent provision respecting classes of persons entitled to hold office. The constitution establishes many disqualifications for office, as of age, foreign birth, &c., showing that the whole people are not willing to leave the selection of offices entirely to the discretion of a majority of voters in a locality, as to the particulars specified. Disqualifications have also been established by congress, as in the case of a

person attempting to corrupt a judge, or guilty of certain frauds upon the revenue. The act of 1862, c. 195 (12 Stat. 590), provides that every person guilty of either of the offenses described in that act shall be forever disqualified to hold any office under the United States; and the offenses specified are treason, and rebellion or insurrection; and for each offense the usual criminal punishments—death, imprisonment, and fine—are provided. Suppose that by one act of congress certain high crimes of a political character were declared, and specific punishments provided for each, as death or imprisonment. Suppose a subsequent statute should provide that no persons convicted of any of those crimes should hold certain political offices specified. Could it be seriously contended that the latter statute repealed all the penalties of the prior statute? Suppose a statute should now be passed that no person guilty of pecuniary frauds in office should be qualified to hold any office of pecuniary trust, for a certain time. Would any court decide that the statute repealed all penalties for pecuniary frauds by officers? Would it not be far more reasonable to hold that the statutes declaring disqualifications were political, and not criminal? But the argument is far stronger in the case of a provision in the constitution, permanent in its character, claimed to operate by its own force. There are some things in the language of the amendment which should be considered. The phraseology is not that of penal or criminal law. It does not say that persons guilty or convicted of certain offenses shall be disqualified. The phraseology is that of a general provision of public policy—"No person shall be a senator, &c. * * * who, having previously taken an oath as a member of congress, &c. * * * shall have engaged in insurrection or rebellion." Moreover, not only is there no word of criminal or penal law used, as "guilty" or "convicted," but the amendment denominates its consequences a "disability." "Congress may, by a vote of two-thirds of each house, remove such disability." If, then, the court will consider, first, the probabilities arising from the fact that this provision is found in the organic law; second, the necessity of providing in the organic law for qualifications for office; and lastly, the phraseology of the amendment, we respectfully submit that it can come to no other conclusion than that the amendment, in this respect, establishes certain disqualifications for certain offices as part of our political system, and was not intended by the people to interfere with existing criminal and penal provisions of the statutes. Probably nothing would more surprise the people of the United States than to learn that, by adopting amendment 14, they had repealed all the penalties against treason, insurrection, or rebellion.

The construction contended for by the defendant is made extremely improbable by another consideration. Its effect would be to relieve persons holding high office, and therefore the more guilty, from the penalties of death or imprisonment, and leave those penalties in full force against all persons engaged in a rebellion who did not at the time hold public office. It is in the highest degree improbable that the people have established a discrimination so unjust and absurd. It will also be observed that there is nothing in the amendment making it solely retroactive. On the contrary, it is clearly a permanent provision, prospective as well as retrospective. The effect of the construction contended for would be that, in all future rebellions or insurrections, no office holders under a state or the nation could be punished in any other way than by disqualification for holding certain offices, while all persons not holding office when they engaged in the rebellion would be left subject to any penalties provided, or that might afterwards be provided, for such crimes. It is also worthy of consideration by the court that while the constitution confers the power of granting pardons for offenses against the United States solely upon the president, the "disqualification" proposed by this amendment, is left to be "removed" by a vote of congress.

It has been contended that disqualification for office is a punishment in the sense of the criminal law. In support of that position the counsel have cited Ex parte Garland, 4 Wall. [71 U. S.] 333, and Cummings v. State of Missouri, Id. 277. But in those cases the court said nothing inconsistent with our position. On the contrary, the opinions seem to assume that disqualifications touching merely the tenure of public office are not necessarily penal, and the court held that the disqualifications in those cases were penal, because they affected men in the ordinary pursuits of life as private citizens. Indeed, disqualifications for office have no necessary connection with crimes or penalties. The accidents of birth or age impose disqualifications as serious as those which result from fault. It is entirely competent for the people to declare that persons found in certain predicaments shall be deemed unfit to hold certain offices. Public good may require such a provision, whether the person's being in the given predicament is or is not the result of misconduct; and, if it be the result of misconduct, there is no reason why the guilty person should not also be punished by the usual criminal penalties. Another objection is that if the amendment inflicts a criminal punishment, and operates upon this defendant, it is ex post facto; and, as there are no judicial proceedings, it is subject to the objections which exist against bills of attainder, and bills of pains and penalties. It is not to be presumed that the people made provisions of that character.

Second. Assuming that amendment 14 does

inflict a criminal penalty retroactively and by its own force—the question remains whether it necessarily touches the crime of treason by levying war, so as to repeal penalties for that offense. There is no constructive repeal of penalties unless the offense is identical, and there is a positive repugnance between the last and the former penalties, or they are irreconcilably inconsistent. Repeals by implication are not favored, and new provisions of law are presumed to be cumulative, auxiliary or otherwise, and not to operate as repeals. Wood v. U. S., 16 Pet. [41 U. S.] 342, 362; In re Aspden's Estate, 2 Wall. [69 U. S.] 368; Davies v. Fairbank, 3 How. [44 U. S.] 636; McCool v. Smith, 1 Black [66 U. S.] 459; Harden v. Gordon [Case No. 6,047]; Harford v. U. S., 8 Cranch [12 U. S.] 109; Sedg. St. & Const. Law, 127; 1 Bish. Cr. Law, § 197 et seq. But the amendment 14 and the statutes against treason do not relate to the same offense. The words "treason," "levying war," are among the most ancient phrases of political criminal law, introduced into our system at the beginning, and having an established judicial and legislative construction. The amendment avoids both those phrases, ex industria, and selects other phrases the construction of which is equally well settled, viz., "insurrection or rebellion," and "giving aid and comfort to the enemies."

Although treason by levying war, in a case of civil war, may involve insurrection or rebellion, and they are usually its first stages, they do not necessarily reach to the actual levying of war. The act of 1793, c. 36 (1 Stat. 424), assumes that parties may be in a state of insurrection, and be treated as insurgents, before the president can issue a proclamation requiring them to retire to their homes before a time named; and it is only after disobedience to that proclamation that he can use the militia or land or naval forces against them. In the Prize Causes, 2 Black [67 U. S.] 635, it was decided that in the case of an instant levying of war, where the parties did not rest at the stage of mere insurrection or rebellion, the president might use the land or naval forces at once. In the same case, it was decided that, if the acts of the parties concerned amounted, in extent and character, to a levying of war against the United States, the government, in all its branches, might resort to blockade, and the search of neutral vessels on the high seas, as in the case of a war inter gentes; and this levying of war was fully recognized by the nations of Europe as establishing a status of belligerency on the high seas. It can not be supposed that all these powers would be developed, and all these rights exist, from the mere fact that the acts of parties amounted in law to "insurrection or rebellion," if they did not advance to the stage of actual levying of war. Nor is the levying of war any less treason, or to be regarded by the judiciary as anything else than treason, because

its first developments may have been rebellious and insurrectionary in their character. The acts of 1861 and 1862 (12 Stat. 284, 589), recognized the distinction in the most complete manner; and for treason, which requires a levying of war to exact the penalty of death, or of imprisonment not less than five years, and fine not less than ten thousand dollars; while engaging in "insurrection or rebellion" is punished by imprisonment not exceeding ten years, or fine not exceeding ten thousand dollars, or both. The judicial department of the government has recognized this distinction, and has treated several cases of insurrection with armed force as not cases of "levying war." U. S. v. Hoxie [Case No. 15,407]; U. S. v. Hanway [Id. 15,299]; and Grier, J., in the Prize Causes, 2 Black [67 U. S.] 635. There is another respect in which the amendment and the statutes against levying war are diverso intuitu. The offense to which the amendment refers is the breach of the official oath and duty, by the engaging in rebellious acts after taking the oath of office. The oath and the holding are of the essence of the offense. The statutes against levying war have no reference to official duty, and the indictment in this case does aver that the defendant held an office, or had taken an oath of office.

On the whole, we respectfully submit that the true construction of the fourteenth amendment is, that the people of the United States have, as a part of their political system, established a rule that certain offices shall not be filled by persons who, having once filled them, have broken their oaths by joining an insurrection or rebellion, whether they have or have not actually levied war against the United States, in the sense of the criminal law; and that this general provision of a political and organic character is not inconsistent with, and does not repeal criminal and penal statutes respecting treason by the levying of war.

Mr. Dana was followed by Mr. O'Conor, who closed the argument for the defendant. He said:

This motion has been met in a manner which reflects credit upon the government, its officers, and their associates. No facts are denied; no forms or special pleadings are insisted upon, nor are any technical impediments whatever interposed. By their consent a great judicial question is withdrawn from the inappropriate forum to which misconceptions had attempted to consign it. It was presented to the proper tribunal at a time and place, and under circumstances well calculated to secure a just solution. This tribunal is the highest which could take cognizance of the case, and its presidency is occupied by the foremost of our judicial magistracy. These facts unite with cherished reminiscences to dignify the occasion. This state gave birth to Washington, the father of our republic; and here in its capital city, and in this very court, sat in judgment the most

renowned and revered of our past chief justices, when as an oracle to guide his own and succeeding times, he gave the first practical illustrations of American law concerning treason. In these aspects the venue is fortunate, whilst in any other it would have been most unfit. Some who are wholly incompetent to deal with such questions, or to comprehend the necessities of a transaction greatly peculiar and exceptional, would not have allowed the forensic debate now in progress. They would fain have enacted here an absurdly grotesque drama. They would have impanelled twelve Virginians as a jury for the investigation of disputable facts, requiring them to hear proofs, attentively to consider arguments thereon, and gravely to respond on oath to the inquiry whether Jefferson Davis had participated in the great territorial civil war recently pending in the state, of which he was the known and acknowledged chief. When it is considered that the hostile territory embraced the entire length and breadth of the state, and impressed upon all its inhabitants for the time, including the jury themselves, the character of public enemies to the government, no commendation can be deemed too high for the enlightened resolve which has rescued our jurisprudence from the stigma of tolerating such a procedure. That resolve on the part of the government's law advisers is itself a concession that such indictments as those before you are not sustainable. It is persuasive evidence that the constitutional amendment now under consideration was framed with intent to prevent the further employment of such instrumentalities in spreading vexation, terror, and annoyance amongst the vanquished people of the south.

When military resistance and every other form of organized opposition to the government had ceased, the congress, the states, and the people, properly turned their attention to the restoration of tranquillity, and no measure could have been adopted more conducive to that end than this third section of the new fourteenth article, provided it shall here receive the benign and politic construction for which we contend. It enacts in substance that no person shall hold any office, civil or military, under the federal government, or under any state, who, having previously taken an official oath to support the constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof. The first proposition of my associate, Judge Ould, is that, whatever may be its effect, this constitutional provision executes itself, and requires for its complete enforcement no judicial action. This is too manifest for denial, and seems to be conceded. In the second place, he claimed that it inflicts a punishment. This is denied; and on me devolves no further duty than that of sustaining his argument in this respect against the objections made to it. No more

need be done, for if that point can be sustained the indictments must be quashed.

And from all inquiry into merely technical interpretations, common sense could not fail to discern that disqualification to hold office is a punishment. The persons upon whom the sentence here operates are those who have already held official station, and been accustomed to the honor and distinctions which flow from the possession of political power. They are, and have long been the elite of their section. They have been reverenced as its guides and leaders throughout whatever of good or evil has marked its history in their day. In the defeat of their enterprise, the slaughter of friends in the field, the loss of fortune, and the ruin and desolation consequent upon these things, there are entailed upon them woes that might satiate any ordinary thirst for vengeance: all that, however, relates merely to the past. But in stamping upon such men the dishonorable brand of perpetual incapacity for public trust, is it possible to maintain that no punishment is inflicted? Most other penal inflictions touch only the person; this wounds the mind. It condemns the proud-spirited leader of his countrymen in peace and war, henceforth to walk his native soil in a rank far below the humblest of his former servants—a moral leper stigmatized in the constitutional law as unworthy of any trust, however trifling. In case of a foreign invasion he is indeed allowed to bare his bosom on the field in his country's defense, but this must be done, if at all, in the ranks as a private. Though among the bravest of the brave, and endowed with great ability to lead or otherwise execute the duties of a soldier, he may not be able to serve in the ranks, for physical strength is not always an accompaniment of intellectual excellence. In such a case the glorious privilege of contending for his country, and surrendering life, if needful, in her behalf, is virtually denied him. And this for what reason? Why, because he is a proclaimed traitor and quasi perjurer. It is because untried and unheard he has been condemned as utterly unworthy of trust or confidence. Seclusion from the paths of duty, honor, and renown, by an irreversible conviction for asserted perjury is surely an infliction, and as against the class in question is the severest that human ingenuity could have devised. It was not only of the severest nature, but according to the conception entertained of the offenders by those who devised it, the most poignantly afflictive. It touched precisely the offending part. Their crime was deemed the offspring of a lawless ambition, and by this disfranchisement, self-respect was incurably wounded—any future indulgence of ambitious aims was rendered impossible. This view of the subject has been treated almost scornfully. Suggesting, with truth, that the erring multitude who never held office are not, according to our views, within the scope of this amendment, the

learned counsel for the government pronounces the construction unreasonable. The leaders have, as he expresses it, added perjury to treason, and he accounts it unjust to visit them with no other penalty than a disqualification to hold office, leaving subject to indictment and the halter that less culpable class who were misled by their arts and contrivances. A practical discrimination of this kind might indeed seem objectionable; but the idea is altogether fanciful. Amongst civilized nations it has never been thought admissible or possible to prosecute the multitude. The undistinguished individual members of a rebellious state have never been thus dealt with. No great civil war was ever followed by an attempt to inflict punishment upon the masses through proceedings in the civil tribunals. Even when such forms have been dispensed with, and summary military executions resorted to, none but the most barbarous nations have ever gone so far as a decimation of the vanquished. There never was any danger or any possibility of such a course in respect to the people of the southern states. Great as is the number interested in advising prosecutions, practice illustrates the truth of these remarks. Throughout the south nearly every man and woman, nay, almost every child capable of participation, gave aid or comfort in some form to the cause of their section during some part of the recent conflict, yet now, after the lapse of three years from its termination, not one single private individual of this great multitude has been prosecuted. The many have not been indicted, nor is there any disposition or intent to indict them. The counsel may, therefore, relinquish his fears in their behalf: they can dispense with his sympathy: they are safe in their numbers and their obscurity, so far, at least, as respects the danger of indictments for treason. Not a single prosecution of the kind has been instituted except against persons of the very classes named in this amendment. Of these not more than a dozen have been prosecuted; and the government, to its great credit, has never attempted to bring one of these to trial. No man who fought in the Confederate ranks, or otherwise served the insurrection in a private capacity, has been indicted. Thus, the actual practice in this instance is shown to be in conformity with the experience of other times and countries in dealing with rebellions. In this fact is found a full answer to that argument against us which, it must be confessed, might strike an unreflecting person as plausible. Indictments, trials, and formal execution on the scaffold for political action deemed criminal in the peremptory judgment of the victor, are honors reserved for the chiefs only; and, therefore, in substituting another punishment it was quite natural that the framers of this amendment should have taken no notice of the many. An immutable state policy provided amply for their protection. An assurance to them that peace was restored, was indeed advisable. As a measure of statesmanship, it was dictated by wisdom, by humanity, by patriotism, and no form of giving expression to that assurance could have been more discreet on the one side, and more satisfactory on the other, than an irreversible prohibition of all future prosecutions against the leaders. Such was the true intent and aim of this amendment. General amnesties are appropriate to the termination of a civil war. If the construction contended for imparts in practical effect that character to the clause, the court should not be the less willing to accept it. Benignity toward the vanquished has been practiced even by monarchical power; it is eminently worthy of a republic. For proof of this I refer to 12 Car. II. c. 2, § 23.

Judge UNDERWOOD. How long after the restoration was that?

Mr. O'Conor. One year.

CHIEF JUSTICE. That was not a well executed amnesty, except by the execution of many whom it amnestied.

Mr. O'Conor proceeded:

In the reason of the thing, and according to the authorities cited by my associate, Judge Ould, disqualification to hold office is a punishment, but the constitution itself affords positive proof that it is so considered. The entire constitution, including all its amendments, is to be regarded as one instrument, and each of its provisions is to be construed in harmony with all others contained in it. The first article provides in its third section that "judgment in cases of impeachment shall not extend further than removal from, and disqualification to hold office." It then superadds, that nevertheless "the party convicted shall be liable to indictment, trial, judgment, conviction, and punishment according to law." If disqualification to hold office was not regarded by the framers of the constitution as a punishment, this additional provision would not have been necessary or proper; and from its insertion an irresistible implication arises that within the true intent and meaning of the fundamental law, such a disqualification is a punishment inflicted upon the individual against whom it is denounced or adjudged. The punishment in the section just referred to, is there called a "disqualification;" the penalty denounced in the amendment which we are considering, is called a "disability." No jurist will deny that these two words as employed in those provisions are perfectly and strictly synonymous. The new fourteenth article is but a supplement of the constitution, and it can not be supposed to employ similar language in a sense different from that which governed in framing the original instrument. If it was not intended to make the disability denounced in the amendment, and inflicted by it, a substitute for any criminal or other prosecution to which the persons thus punished might have been before liable, a declaration to that effect would certainly have been added, as in the

clause concerning impeachments. It is not necessary to deny that preventing the appointment or election to public office of persons deemed unworthy, was an object of this amendment. That motive might well co-exist with the design to punish. Both certainly governed in framing the first branch of the impeachment clause. The · second branch proves it. Indeed the primary object of all criminal law is to protect society by remedies for existing or anticipated evils. The object is not to wreak vengeance on the individual. Still, if the remedy resorted to be in itself punitory, a second punishment can not be inflicted as of course. The express sanction of some paramount law is needed to authorize such a departure from general principles.

The counsel for the government, assuming the provision to be prospective, contends that our construction would make it hold out a standing invitation to every artful man having treasonable objects in view to obtain office if practicable, and take an oath to support the constitution as a preliminary step in crime. It is asked whether one who had thus sworn to support the constitution would thenceforth stand privileged to engage in rebellion against the government, without danger of any more serious penalty than disfranchisement. whilst the comparatively venial offender who had never been confided with a public trust, and had not forsworn himself, might be hanged for a similar offense? This argument loses all force, and the illustration becomes pointless, the moment it is perceived that the provision is retrospective only. Penalties and punishments denounced by positive law are prima facie prospective only: the ordinary legislator is rarely empowered to give them a retrospect. But the sovereign authority from which this provision emanated was under no other than moral restraints in that respect; and it will be conceded that the disqualification is denounced for offenses previously committed. That intent can not be denied, and the words employed are adequate to express it. But they are wholly incompetent to include both past and future delinquents. To reach the latter other words would clearly have been necessary: we therefore respectfully insist that pre-existing offenses only are within the scope of this provision. But if it is to be deemed capable of embracing also future offenders, still its operation as to them would be very different. Both the statutory punishment and this constitutional disqualification being enacted previously to the offense, no principle would be violated by imposing both penalties. But so far as this clause affects precedent offenses, unless it be taken as substitutionary, it would violate natural justice. In that case it would, contrary to recognized principles, add after the offense a new penalty to those which existed at the time of its commission.

The counsel now representing the government are evidently themselves convinced that the motion must prevail if a disability to hold office denounced against alleged offenders for their acts shall be deemed by this court the infliction of a penalty or punishment. Clearly it is in fact, and was deemed a penalty; it is impossible to avoid that conclusion. No one can suppose that an additional punishment for previous offenses was intended. leaving the offenders. subject to those previously existing. Indeed the government counsel do not contend for that position: they content themselves with persistently denying, contrary to the manifest fact, that the clause is at all punitory. We trust this point will be determined against them. It is required by principles of natural justice, which have been recognized from the earliest times. They are older indeed than any of our written laws. At the close of the Rebellion there were controlling reasons of policy in favor of adopting disfranchisement for participating in the Rebellion as a substituted punishment in lieu of the pains and penalties denounced in the crimes acts. A state of things existed which rendered criminal prosecutions under these acts inexpedient if not absolutely impracticable. yet it was difficult to argue successfully against a prevailing and irrational outcry for experiments in that direction. Many disturbers urged them. These persons were not prepared to hear, much less to acquiesce in the reasons which justified a refusal to keep up a war of indictments against the southern leaders. Sound minds having influence in public affairs therefore devised this amendment as a method of extricating the administration from a perplexing dilemma. The construction for which we contend can alone give it this effect. Such was, undoubtedly, the intent of its framers; and, if so expounded by the courts, its operation will be as benign as its conception was just, wise, and politic. That insuperable difficulties lie in the way of maintaining indictments for treason against the chiefs of the late insurrection is obvious. That any difficulty, even the slightest, can be encountered in such prosecutions is. to be sure, utterly incomprehensible to a certain narrow-minded class. The latter view the transaction precisely as they would the riotous action of a few school-boys during part of a summer afternoon. This court will entertain a larger and truer conception of its nature and consequences. When an insurrection has reached the dimensions of a territorial civil war, and has upheld its dominion over a territory and people for a considerable period, the authority of the lawful government is suspended in fact, and its municipal laws are suspended for the time, except so far as the rebels adopt and act upon them as their own. Consequently, belligerent rights arise. The lawful government is unable in fact to extend any protection to the peaceful inhabitants within the rebel lines; and, as a matter of policy, it outlaws them all, the most innocent and loyal in common with

the most guilty and disloyal. Women, children, idiots, lunatics, and all who from mental or physical imbecility are unable to leave the country, are denounced as enemies. Not only is protection withheld from them, but their property, wherever found, is seized upon as lawful prey and prize by the government forces. The supreme court decided that the Rebellion in the southern states reached such dimensions and acquired such permanency as to impress upon the Confederate territory and all the people within it, these hostile and essentially foreign relations toward the government of the United States. This state of things having existed for several years, and over a widely extended territory containing millions of inhabitants, it would be manifestly inconvenient and oppressive if, at the close of the conflict, the municipal law of the rightful government could at once come into full operation in respect to all intermediate belligerent acts, and be administered precisely as if no such interregnum had existed. The Rebellion in this expanded form, with all the attributes de facto which belong to an independent state, lasted four years; it might have lasted forty years, or a hundred years. The same principles of law would apply in each of these cases; and it would be a novelty in jurisprudence if courts were to disregard as utterly inconsequential such a long exercise of independent power. Such ideas can not be practically enforced. Let us imagine a century of successful resistance, and the Southern Confederacy at last stricken down by the power of the government. If the war wrought no change during its existence in the duties of the people and the rights of the government, the laws and tribunals of the United States would immediately resume their sway, all intermediate acts would be treated as if the country was, during the whole interval, in its normal condition. The great grandson of Jefferson Davis, born in a nation de facto maintaining open and acknowledged war with the United States, and whose ancestors for two or three generations had stood in that same relation to our government, might be at once tried and executed as a common rebel and traitor. The argument for the prosecution in that case would be as direct and simple as it is in the present. The United States having claimed sovereignty over the land of his birth at all times from the inception of hostilities, had at last maintained its claim by the ultima ratio. He was a citizen born; his long and successful resistance would avail not. It would be deemed merely an aggravation of his imputed crime. The argument would be brief, and it might be thought unanswerable; the indictment could be put in due form; and if, as some short-sighted people suppose, such a thing is practicable in this case, conviction and execution might promptly follow in that case. But such a procedure would outrage the moral sense of all civilized nations, and cover the perpetrators with infamy; yet, if the municipal law of the rightful government be not, in some degree at least, displaced by the state of belligerency between it and the rebels, such an indictment, conviction, and slaughter would be juridically unexceptionable.

Even in respect to civil controversy, such a civil war must work important changes. It can not be regarded as in all respects a mere riot. It is familiar doctrine that every member of a co-operating party engaged in violently executing an unlawful enterprise, is responsible for all injuries done by his associates. If the existence of our civil war worked no change in the application of this rule, any loyal citizen or soldier who suffered wounds or other injury during the late struggle, no matter where or how, could maintain a civil action for damages against any one or all of the thousands who served in the Confederate army. The common judgment of all our people that no such action would lie, is proven by the fact that no such action was ever brought. Occasions for it have been numberless, and a taste for litigation is not rare. Common sense has dictated to common minds that an open recognized civil war does work a very important change in this respect. The reluctance of the government to prosecute their criminal cases is also strong evidence of similar views in high places. From these and other considerations that might be offered we assert as an undoubtedly sound proposition of law, that belligerent acts upon the rebel side performed in the due and orderly prosecution of a recognized civil war are not proper subjects of criminal prosecution during the conflict or after its close. This doctrine might not satisfy the demands of justice if there were no other method of punishing gross delinquency in maintaining a rebellion; but the methods are ample. The war which displaces the municipal law, furnishes its own remedies The very defeat of the rebels carries with it a multitude of inflictions; and if by conducting the war in an inhuman, cruel, or improper manner, they actually merit severe punishment, it may be inflicted without a resort to the civil tribunals. In such a case the leaders may be executed after or without a summary trial by court martial; the privates may be decimated or quarter wholly refused to them. There is no law capable of being enforced which enjoins upon the victor in war an obligation to spare his vanquished adversary. In the absence of compassionate feelings on his own part, he is under no restraint, except his respect for the common sentiment of mankind, and his unwillingness to incur the just censure of future ages.

When the vanquished in any such case have conducted themselves in so criminal a way as to deserve extreme severity, it may be employed against them with entire impunity. When they have not thus offended it ought not to be employed. It will, therefore, be seen that there is no occasion for

resorting to the civil magistrate at the close of a civil war. His powers by indictments and trials by jury are not necessary to the just punishment of wicked rebels for warring against the government. But one motive could induce a victorious general, at the close of the civil war, to deliver his conquered adversary to the civil magistrate as a traitor; and that is a cowardly reluctance to confront the judgment of mankind on his own act in condemning the prisoner to a military execution. To be employed in thus shielding from responsibility a cruel and revengeful spirit would be a mean office. It is greatly to be regretted if, under any circumstances, the judges of the law could be compelled to perform it. But in the very nature of things, and by the fundamental principles of jurisprudence, they are necessarily exempted from it. In cases of civil war the right to prosecute the multitude in the ordinary course of law never was desired by any government, and as against the leaders it is upon general principles impossible. Their acts are public, open, and notorious. They do not form a legitimate subject of proof or disproof in a court of justice. Known to the government in all its departments, they are also actually and officially known to the judges. A demurrer to the plea of not guilty would seem a very fitting step for the prosecutor. A plea which the pleader would not be permitted to prove by witnesses could hardly be allowed as a bar. So much for the evident impracticability of employing the courts in such proceedings. This is an obstacle arising out of the very nature of things. But the sixth amendment to the constitution contains by implication, or at least by its necessary effect, a prohibition of such prosecutions. It is as follows: "In all criminal prosecutions the accused shall enjoy the right of a speedy trial by an impartial jury of the state and district wherein the crime shall have been committed; which district shall have been previously ascertained by law." An impartial jury in the present case is an impossibility. To obtain one in any similar case that may possibly hereafter arise, will be alike impossible. The trial is required to take place in the very seat and hotbed of the Rebellion, where the jurors themselves must have actual personal knowledge of the principal facts which, upon an indictment and plea, would be formally put in issue. However fit to serve as witnesses, or to stand in the dock as prisoners, the inhabitants of the rebel district can never be competent jurors. Submitting to a jury of the county of Henrico the question whether an open and public war against the United States was here maintained and waged, and whether Jefferson Davis was the leader of it, would be not only a mockery and a farce, but a plain violation of the constitutional requisite that the jury shall be impartial. It is quite apparent that such a jury never can by any human possibility be found in the identical state or district in which such a public territorial war as that under consideration shall have been prosecuted. Taking this into view, and seeing that the constitution requires a speedy trial, and forbids it to be had elsewhere, there results by obvious necessity a practical prohibition of indictments for treason in such cases. What the constitution renders practically impossible it in effect forbids to be done. There can be no reasonable doubt that such was the intent of the Revolutionary fathers. We find in the history of the times an adequate stimulant and incentive. It was in 1745, whilst many of those who subsequently participated in the Revolution and in forming the constitution were yet in their early youth, and glowing with the compassionate sentiments which are then most active, that precisely such cruelties as this sixth amendment forbids were perpetrated in the mother country. No doubt they excited a thrill of horror and indignation throughout the colonies. The so-called Scotch rebels supported the Stuart, whom, not without some show of reason, they sincerely believed to be their legitimate sovereign. An honest if misguided loyalty animated their devotion to his cause, but superior force prevailed, and they were conquered. After their defeat the leaders were subjected to civil prosecutions for treason. They were not tried by or among their own countrymen; conviction there might have been impossible. They were dragged from their mountain homes to the county of Surrey, and there tried before special commissioners and English juries, to whom impartiality could not have been imputed. They were generally convicted and executed with all the attendant horrors enumerated in the barbarous treason sentence. They were hanged, drawn, and quartered. Many of the cases are stated in Sir Michael Foster's Treatise on Crown Law. This work, first published in 1761, soon found its way across the Atlantic; and just about the time when "the troubles in America," as they were called, began to unsettle British authority here. The harsh treatment and cruel fate of these true-hearted people were thus fully described and made known to our people. One of the most thrilling of these scenes was the subject of Shenstone's touching ballad, "Jemmy Dawson." It can not be doubted that the feelings excited by these cruel prosecutions induced the adoption of this sixth amendment. It was intended that no such transactions should ever stain the judicial annals of our country. It is fairly supposable that the far-seeing men who guided popular action in those days intended to render utterly impracticable such governmental measures at the close of any civil war that might perchance occur as a set of indictments for treason. They intended to let civil war, if it should arise, apply its own remedies for whatever of wrong might be committed in its progress. To harass a vanquished district with indictments for political offenses

was not in their eyes a judicious policy. Honorable combat in the field should never be followed by a sordid persecution of the vanquished brave in criminal courts through the vile agency of spies and informers. It can not be said that civil wars were not contemplated as possible or probable. In the Federalist (letter No. 28), Alexander Hamilton himself portrayed in vivid colors as a possible future event, armed resistance of the federal government by a state or several states acting in concert and acting very effectively. The possibility of such events as have recently transpired in the south was foreseen. The sixth amendment was framed expressly to prevent this precise mischief in case they should occur, and the third section of the fourteenth article was framed in the same spirit. We respectfully insist that the court should interpret it accordingly, and by dismissing these vexatious prosecutions, give an assurance to the whole country that in all its forms the late unhappy conflict is ended. All honest admirers of that universal suffrage which has been established through this great civil war, earnestly desire that it should be accompanied by an amnesty as nearly perfect as possible of all political offenses committed during the struggle. Good men of all parties must entertain similar wishes.

On Saturday morning, December 5th, THE CHIEF JUSTICE announced that the court had failed to agree upon a decision in regard to the motion made to quash the indictments against Mr. Jefferson Davis.

The counsel for the defendant then asked that the fact of the disagreement be certified to the supreme court of the United States.

THE COURT signified its acquiescence, and thereupon the following paper was entered upon the record:

"At this term of the court, begun and held at Richmond, in the said district, on the 23d day of November, 1868, and continued until this day, a motion was made on behalf of the defendant to quash or set aside the said indictment, and to dismiss the same and the prosecution thereof. And upon that motion it appeared that the said Jefferson Davis, having previously to the offenses charged in the said indictment taken an oath as a member of congress to support the constitution of the United States, the question arose whether, by the operation and effect of the third clause of the fourteenth amendment to the constitution of the United States, the defendant is exempted from indictment or prosecution for treason in levying war and participating or engaging in the late Rebellion. And upon that question the opinions of the judges were opposed. And thereupon the said point is upon the request of the said defendant, stated under the direction of the said judges, and certified under the seal of the said circuit court to the supreme court of the United States at its next session."

After this certificate had been filed the district attorney (Beach) said the only thing now necessary to be disposed of, was the appointment of the day for the trial. As counsel were anxious for a full bench on the occasion, he suggested the naming of some day after the adjournment of the supreme court before the close of the present term of the court.

THE CHIEF JUSTICE. The difficulty is in fixing a day when there will be a full bench, as it is impossible to tell how long the supreme court may remain in session.

Mr. O'Conor. In order that counsel may be definite in their appointments, he was rather inclined to ask that the recognizance of Mr. Davis be renewed for the May term.

THE CHIEF JUSTICE. Well, the recognizance may be renewed at any time during the present term. It is quite probable, however, that the court will adjourn before Christmas. The recognizance must, of course, be renewed before that time.

Mr. O'Conor. It will be renewed immediately, to-day or on Monday.

THE CHIEF JUSTICE. Very well. The certificate of disagreement has been made, as requested by the defendant. It may be filed, and a copy forwarded immediately to Washington.

Whereupon the court adjourned.

No further proceedings were had in the cause. The proclamation of general amnesty by the president of the United States at the end of December, 1868, effectually disposed of the criminal prosecution, and the certificate of disagreement rests among the records of the supreme court, undisturbed by a single motion for either a hearing or a dismissal. At a subsequent term of the circuit court, the indictments against Mr. Davis were, on motion of his counsel, dismissed.

THE CHIEF JUSTICE instructed the reporter to record him as having been of opinion on the disagreement, that the indictment should be quashed, and all further proceedings barred by the effect of the fourteenth amendment to the constitution of the United States.